ESTATE of H. H. WEINERT, Deceased,
Jane W. Blumberg, Executrix, and
Hilda B. Weinert, Petitioners,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 17992.

United States Court of Appeals
Fifth Circuit.

Aug. 31, 1961.

Stanley Schoenbaum, Leon O. Lewis, San Antonio, Tex., for petitioners.

Lee A. Jackson, Atty., Dept. of Justice, Hart H. Spiegel, Chief Counsel, I.R.S., C. R. Marshall, Sp. Atty., I.R.S., C. Guy Tadlock, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Meyer Rothwacks, Melva M. Graney, Kenneth E. Levin, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before CAMERON, BROWN, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case presents an oil and gas income tax problem concerning an oilman-investor sharing arrangement cast in the outward form of a loan, but one that is in substance a carried interest transaction [1] or a carved out production pay-

1. "A carried interest is an arrangement between two or more co-owners of a working interest, whereby one agrees to advance all or some of the development costs on behalf of the others and to recover such advances from future production, if any, accruing to the other owners' share of the working interest." Breeding and Burton, Taxation of Oil and Gas, § 2.08 (1961). Most commentators recognize three types of carried interests, named for the taxpayers in the three leading cases: (1) the Manahan, (2) the Herndon, and (3) the Abercrombie. Manahan Oil Company, 1947, 8 T.C. 1159; Herndon Drilling Company, 1946, 6 T.C. 628; Commissioner of Internal Revenue v. J. S. Abercrombie Co., 5 Cir., 1947, 162 F.2d 338. See Breeding and Burton, Taxation of Oil and Gas Income, § 2.08 8.15 (1961); Mertens, Federal Income Taxation § 24.25b; Williams and Meyers, Oil and Gas Law, § 424.1; Fiske, Federal Taxation of Oil

ment[2] for development. The taxpayer's original brief describes the arrangement as a carried interest transaction. The Commissioner, relying on Lake,[3] describes the arrangement as an oil payment that is nothing more than an assignment of future income. In reply briefs the taxpayer appears willing to accept the change in nomenclature, if the Commissioner will accept *all* of Lake; the Lake opinion excludes from taxable assignments of income carved out payments pledged for development. The case turns on economic interest, not correct nomenclature.

The taxpayer, the carried party, sold to the investor, the carrying party, for $100,000 cash, (1) a one-half interest in certain unitized oil and gas leases and a processing plant to be built and (2) a $50,000 production payment payable out of the retained half. There is no tax issue as to this sale. In addition, the carrying party agreed to make "loans and advances", up to $150,000, to pay the taxpayer's proportionate share of development costs (drilling, operating, and cycling plant costs) repayable solely out of net profits from the carried party's retained half interest in the leases and

and Gas Transactions, § 14.13; Galvin, The "Ought" and "Is" of Oil-and-Gas Taxation, 73 Harv.L.Rev. 1441, 1492–94 (1960); Monacelli, Sharing Risks and Costs in Mineral Development and Operation: Allocating the Tax Deduction, N. Y. U. 19th Annual Institute on Federal Taxation, 1079, 1093–95 (1961); Bullion, A New Look at Tax Aspects of Oil and Gas Sharing Arrangements, Southwestern Legal Foundation 8th Annual Institute on Oil and Gas Law and Taxation, 603 (1957); Winstead, Carried Interest and Net Profit Interest, Southwestern Legal Foundation 2nd Annual Institute on Oil and Gas Law and Taxation 517 (1951).

In the Manahan type of carried interest, approved by the Revenue Service in GCM 22730, the owner of the working interest, the carried party, *A*, assigns all or part of his working interest to the carrying party, *B*, subject to a right of reversion in favor of *A*. Thus, after *B* has recouped the development and operating costs, he re-assigns the specified fraction of the working interest to *A*. But if *B* never recovers his cost from production, *A's* reversionary interest in the property will never take effect. See Breeding and Burton, supra § 8.15.

In the Herndon type of carried interest, the owner of the working interest, the carried party, *A*, assigns to the carrying party, *B*, an oil payment or production payment as well as a fraction of the working interest. The production payment is equal to the amount of development cost attributable to *A's* retained working interest plus operating costs during the "pay-out" period. Thus, *B* receives the entire income from production (his own working interest, plus the production payment) until the end of

the "pay-out" period. See Breeding and Burton, supra § 8.16.

In the Abercrombie type of carried interest, the carried party, *A*, assigns a fraction of his working interest and mortgages or gives a lien on his retained interest to secure repayment of development advances made on his behalf by the carrying party, *B*. The advances made by *B* are regarded as a loan repayable only out of *A's* interest. See Breeding and Burton, supra § 8.17. Hambrick considers that the situation in Abercrombie, ironically, was not a true carried interest. Hambrick, A New Look at the Carried Interest, 10th Annual Tulane Tax Inst. (1961) 304, 339.

2. "A production payment [oil payment] for federal tax purposes, is a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited time, or until a specified sum of money (which may be determined by a formula) or a specified number of units of oil or gas has been received." Breeding and Burton, Income Taxation of Oil and Gas, § 2.07 (1961).

3. Commissioner of Internal Revenue v. P. G. Lake, 1958, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743. The Commissioner's brief pointed out that in Lake "The theory of the Court was (p. 226) that—'The substance of what was assigned was the right to receive future income'." The taxpayer's reply brief contends that the fundamental error committed by the commission is that he misconstrues P. G. Lake since "the transaction here involved the assignment of an oil payment to Lehman in return for amounts pledged to the development of the oil and gas property", the situation envisaged by the Supreme Court in footnote 5 of the opinion.

the plant. The taxpayer had no personal liability for these loans and advances. Simultaneously with the execution of these agreements, the carried party assigned to a trustee his retained half interest in the leases and the plant, under a trust agreement requiring the trustee to pay all of the income to the carrying party until he recouped his development costs. The tax issue relates to this transaction. The question for decision is whether the carried party is taxable on the revenues paid to reimburse the carrying party for the advance of development costs.

A majority of the Tax Court, 31 T.C. 928, considered that the form of the transaction was controlling; that limiting the carrying party's recovery to the taxpayer's one-half interest in the leases and recycling plant could not "convert what was clearly a loan * * * into a conveyance of the equitable interest in the oil and gas in place, or into an unfettered assignment of the right to future income for a consideration". Since this was the rationale of its decision, the Tax Court did not reach the question of whether the carrying party acquired the economic interest in the minerals in place. Abercrombie is conspicuous by its absence from the opinion. The Tax Court distinguished its decisions in Manahan,[4] Prater,[5] and Wood.[6] Three judges concurred only in the result. They rejected the majority's reasoning that such transactions were loans, but held for the Commissioner on the ground that the carried party's right of recovery extended to the net profits from the cycling plant as well as from the mineral production; that, therefore, under Anderson v. Helvering,[7] the carrying party did not possess the economic in-terest in the minerals in place that would shift to him the tax burden.

Before this Court the Commissioner relies: (1) on Abercrombie and Prater to show that the carrying party's advances were a loan; (2) on Lake to show that the carried party received ordinary taxable income at the time when the assigned interest produced the income used in repayment of the loan; (3) on Anderson and LaGloria[8] to show that the carrying party had no economic interest in the minerals in place. The taxpayer contends that: (1) the transaction was not a loan, distinguishing Abercrombie and Prater, and analogizing the case to Manahan; (2) the substance of the transaction was the exchange of a carved out mineral interest for cash sums pledged to the development of the property; and, under Lake, such sums come within an exception to the general rule relating to assignments of future income since they are used to develop the property; (3) Anderson and LaGloria are distinguishable, and the interest the carrying party received in exchange for advancing development costs was an economic interest.

The case is close, but we conclude that the taxpayer's reasoning comes closer than the Commissioner's to carrying out perhaps the most basic principle in taxation: economic realities determine tax consequences. In no area of the law is the application of this principle more necessary than in taxation of oil and gas. This conclusion is in harmony with the administrative position on the allocation of income and deductions in sharing arrangements, a position that since the publication of GCM 22730, 1941–1 Cum. Bull. 214, has been relatively stable.[9]

4. 1947, 8 T.C. 1159.

5. Prater v. Commissioner, 1958, 30 T.C. 1262; reversed, 5 Cir., 1959, 273 F.2d 124.

6. Wood v. Commissioner, 1958, 31 T.C. 528; later reversed, 5 Cir., 1960, 274 F. 2d 268.

7. Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277.

8. Scofield v. LaGloria Oil and Gas Co., 5 Cir., 1959, 268 F.2d 699; certiorari denied 361 U.S. 933, 80 S.Ct. 372, 4 L.Ed. 2d 354.

9. "The income tax treatment of a so-called 'carried interest' transaction has never been clearly or fully established. However, for many years the division of income between the parties to such an

Whether the subject transaction is in the nature of a carried interest or a carve-out for development, its effect is to shift the economic interest in the mineral deposit thereby causing a shift in the division of the taxable income. It is unrealistic to consider it a loan.

We reverse and remand.

## I.

The case was submitted on a stipulation of agreed facts and documents. A review of these shows that the carrying party's so-called "loans and advances" were pledged to the development of the minerals and were a vital consideration for the taxpayer's sale of half the mineral interest and the $50,000 production payment.

The petitioners are the Executrix of the Estate of H. H. Weinert, deceased, and Hilda B. Weinert, widow of the deceased. Mr. and Mrs. Weinert filed joint income tax returns for 1949 and 1950, the taxable years in question. They kept their books and filed their tax returns on the cash basis of accounting.

H. H. Weinert and others (collectively referred to as Weinert or the carried party) owned certain oil and gas leases covering lands in the North Pettus Field in Goliad and Karns counties, Texas. The leases were subject to an operating and unitization agreement pooling the rights in the oil and gas leases in the area as if the unitized substances and land were included within a single lease. Participation in the unit was determined on the basis of acre feet of effective sand put in the unit. The participating parties joined in an agreement with the members of another unit and agreed to construct a cycling plant to process the unitized substances, each of the participants to share in the extracted products in accordance with his interest in the plant. Each participant was personally liable for his pro rata part of all costs and expenses incurred in the development and operation of unit area and in construction annd operation of the processing plant.

April 15, 1947, Weinert entered into an agreement to sell to The Lehman Corporation and Maracaibo Oil Exploration Corporation (collectively referred to as Lehman or the carrying party) an undivided one-half interest in the leases and a $50,000 production payment payable out of the proceeds from Weinert's retained one-half interest and also from his interest in the proceeds of the cycling plant to be built. The agreement stated that the conveyance to Lehman would be subject to the unitization agreements covering the leasehold. The sales agreement provided that "the consideration to Sellers for said interest in said oil and gas leases to be assigned and conveyed to Buyers" is not only $100,-000 in cash but also:

"(b) Simultaneously with the execution and delivery of said assignment and the payment of the purchase price therefor as hereinabove set out, the parties hereto shall enter into a Loan Agreement as per copy attached hereto and marked Exhibit 'B', and the said Sellers shall also execute and deliver the Assignment of Runs and Production Payment from their remaining ½ interest in the leases and acreage to be assigned to Buyers, all as set out in said Assignment of Runs and Production Payment, a copy of which is attached hereto and marked Exhibit 'C'."

arrangement has been reasonably stablized by settled administrative practice. Nearly 20 years ago the Internal Revenue Service completed and published as General Counsel's Memorandum 22730 the results of years of patient and thankless thought designed to construct a system of order in the division of income and depletion from the exploration, development, and production of oil, gas, and other mineral deposits. The basic philosophy of the administrative approach to ventures in oil, gas, and other mineral ventures is that such projects necessarily involve risks, burdens, and benefits which invite a division or sharing among persons jointly interested in the deposits." Hambrick, A New Look at the Carried Interest, 10th Ann.Tulane Tax Inst. 304 (1961).

October 30, 1947, in accordance with the April sales agreement, Weinert executed an assignment to Lehman of an undivided one-half interest in the leases, subject to the unitization agreement. This assignment did not mention the $50,000 production payment. Simultaneously with the execution of this conveyance, Weinert and Lehman executed the other required instruments, the Loan Agreement and the Assignment of Runs and Production Payment. The Loan Agreement provided that Lehman would "loan and advance" to Weinert up to $150,000 to pay Weinert's pro rata share of the drilling costs and the costs of the processing plant and other equipment. The loans and advances were to bear two per cent interest. Weinert signed no notes, obligations, or other evidences of indebtedness. The loans and advances were to be made "as and when Weinert [was] required to pay [his] share of the costs". The principal and interest were to be "repaid only out of the net profits" arising from Weinert's retained interest in the leases and in the proposed plant. As we read the agreement, Weinert incurred no personal liability to repay Lehman for the advances. Referring to Weinert's assignment of his interest to a trustee, the Loan Agreement provided that upon receipt of any revenues from the interest in trust the trustee should "first use such funds * * * to reimburse Weinert for any operating costs". The trustee was to pay Lehman any excess of revenues over Weinert's operating costs, to be applied by Lehman first in payment of interest and principal and then in liquidation of the production payment of $50,000 included in the Assignment of Runs and Production Payment. Finally, upon the liquidation of the production payment, the trustee *and Lehman* were to reassign to Weinert the interest conveyed to the trustee.

In the Assignment of Production Runs and Production Payment Weinert assigned to the trustee his one-half interest in the leases and in the unitized substances under the unitization agreement "for the purpose of securing repayment" to Lehman of "all amounts loaned and advanced" under the Loan Agreement. The agreement assigning runs to the trustee also includes a conveyance of the $50,000 production payment to the trustee, payable to Lehman after payments of all amounts due under the Loan Agreement.

Neither the Commissioner nor the taxpayer makes a special point of the $50,000 production payment. All of the sums paid by the trustee to Lehman in 1949 and 1950 were applied in satisfaction of the advances. There is, therefore, no questions before the Court as to whether Lehman had an economic interest in the $50,000 production payment.

In preparing his tax returns Weinert reported no income or deductions applicable to the transactions involved in this proceeding, except for his share of the $100,000 cash consideration which he reported in 1947. In December 1950 an Internal Revenue agent examined the returns for 1947 and 1948 and concluded in his report that Weinert correctly omitted accounting for both income and deductions with respect to the one-half interest assigned to the trustee. The report states that the "arrangement is one entered into for the development of the property, and that beyond accounting for the cash consideration [of $100,000 for the sale of half of Weinert's interests] which has been done, no gain or loss results from the various oil payments and advance involved". The Commissioner included in the taxpayers' gross income the revenues paid to the trustee in 1949 and 1950, $13,003.49 and $40,820, respectively, and the income from the sale of the processed gas and hydrocarbons. He allowed as deductions the interest shown to be credited by the trustee and depletion on the stipulated market value of the unitized substances before processing in the cycling plant.

## II.

The lack of give in rigid, traditional common law notions of title and ownership, which must be adjusted to the re-

alities of converting fugacious oil and gas into productive property, make the oil man's job and the Commissioner's job less than a happy lot. In making the adjustment, two related fundamental principles must be applied in order to do justice to the taxpayer and to give the tax collector his due. First, substance must take precedence over form. Second, the tax concept of "economic interest" and not the common law concept of title must control the division of taxable income in the development and operation of oil and gas property.

A. The principle of looking through form to substance is no schoolboy's rule; it is the cornerstone of sound taxation, especially of oil and gas transactions which do not fit snugly into common law conveyancing forms. "[T]ax law deals in economic realities, not legal abstractions * * *." Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 315, 76 S.Ct. 395, 399, 100 L.Ed. 347. Discussing oil payment assignments in its important decision in Lake the Supreme Court said: "These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subleties of draftsmanship but by their total effect." [356 U.S. 260, 78 S.Ct. 695.] The most persistent advocate of substance over form is, properly enough, the Commissioner of Internal Revenue. In many areas of oil and gas tax law this Court, agreeing with the Commissioner, has recognized the predominant importance of substance. Taking one recent case for example, Campbell v. Fasken, 5 Cir., 1959, 267 F. 2d 792, 796, while we conceded that the "form of the instruments cannot be wholly ignored in seeking to ascertain their realities and substance even though it is not controlling," we agreed with the Commissioner that the transactions purporting to be sales were in the nature of leases and that initial payments should be treated as lease bonuses or advance royalty payments.

Resort to substance is not a right reserved for the Commissioner's exclusive benefit, to use or not to use—depending on the amount of the tax to be realized. The taxpayer too has a right to assert the priority of substance— at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction. In view of the fact that for "many years, taxpayers and Revenue Service personnel alike have viewed [the carrying party or] the holder of a production share right acquired in exchange for funds pledged for development as the possessor of an economic interest",[10] it cannot be said that the taxpayer was playing fast and loose with the Government.

B. "[T]he office of the economic interest [is] to identify the party to whom benefits and burdens attendant to mineral production are to be attributed for tax purposes."[11] In Palmer v. Bender, 1933,

10. Comment on Weinert, VIII Oil and Gas Tax Quarterly 235, 248 (1959). See also footnote 14.

11. Branscomb, Recent Developments in Oil and Gas Taxation, 11th Ann.Oil and Gas Inst. 615, 617 (SW. Legal Fdn., 1959). On the economic interest concept in oil and gas taxation see Sneed, The Economic Interest—An Expanding Concept, 35 Tex.L.Rev. 307 (1956); Sneed, Another Look at the Economic Interest Concept, 10th Ann.Inst. on Oil and Gas Law Taxation (SW. Legal Fdn., 1959) 353; Sneed, Trends in the Economic Interest Concept, 6th Ann.Rocky Mt.Min.L. Inst. (1961) 35. There are a large number of excellent articles and comments on economic interest concept, sharing ar-rangements, carried interest, and production payments. See Heard, Income Tax Treatments of Production Payments, 8th Ann.Inst. on Oil and Gas Law and Taxation (SW. Legal Fdn. 1957) 563; Bullion, A New Look at Tax Aspects of Sharing Arrangements, 8th Ann.Inst. on Oil and Gas Law and Taxation (SW. Legal Fdn. 1957) 603; Driscoll, The Tax Relationship of Oilman and Investor, 15th Ann.Inst. on Fed.Taxation (N.Y.U. 1957) 315; Bullion, Production Payment Transactions, 6th Ann.Rocky Mt.Min.L. Inst. (1961) 81; Branscomb, Allocation of Income and Deductions in Oil and Gas Ventures, 6th Ann.Rocky Mt.Min.L.Inst. (1961) 105; Caplan, Tax Considerations in Oil and Gas Operations, 4 S.Tex.L.

287 U.S. 551, 53 S.Ct. 225, 226, 77 L.Ed. 489, if not before,[12] the Supreme Court established that depletion does not turn on the "formal attributes" of the legal instrument in question, or on the "descriptive terminology [as a sale or lease] which may be applied" or on "any other particular form of legal interest in the mineral content of the land". It turns on whether a taxpayer has an economic interest in oil and gas in place, "a right to share in the oil produced".

Under Palmer v. Bender two elements constitute the requirement of an economic interest. First, the taxpayer must have acquired by investment an interest to the minerals in place. Second, "he must look for a return of his capital" to the "income derived from the extraction of the oil"—by "any form of legal relationship".[13]

The issue is an economic one. The stake in the minerals is what counts: the income from oil and gas is taxable to the man who risks his stake to produce oil and gas. As the Supreme Court said in Kirby Petroleum v. Commissioner, 1946, 326 U.S. 599, 66 S.Ct. 409, 411, 90 L.Ed. 343: "The technical title to oil in place is not important. * * * Economic interest does not mean title to the oil in place but the possibility of profit from that economic interest dependent solely upon the extraction and sale of the oil." See also Burton-Sutton Oil Co., Inc. v. Commissioner, 1946, 328 U.S. 25, 66 S. Ct. 861, 90 L.Ed. 1062 and Thomas v.

Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324. In Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 400, 100 L.Ed. 347, the last word on the subject, the taxpayers, who owned upland drilling sites, had no legal interest whatever in certain offshore oil deposits, either in fee or in leasehold, but their drilling sites were necessary for the development of the offshore oil. The Supreme Court held that "the law of depletion requires an economic rather than a legal interest to the oil in place"; the taxpayers' contribution of drilling sites in return for a share of the net profits from the offshore wells was "an investment in the oil in place sufficient to establish their economic interest." The same economic interest entitling a taxpayer to depletions subjects that taxpayer to payment of income tax on the depletable production.

The difficulty in applying Abercrombie to sharing arrangements generally is that, however correct the decision may have been on the facts before the Court, the statements in the opinion emphasizing the common law concept of ownership tend to weaken the tax concept of economic interest, so important in oil and gas taxation—to the Government as well as to taxpayers. If Abercrombie is interpreted too broadly, it will discourage sharing arrangements created out of the exigencies of the oil and gas business and necessary, in many cases, to development of oil and gas property. We inter-

Journ. 332 (1959); Benjamin, Recent Developments in the Field of Taxation Affecting Oil and Gas, 32 Tul.L.Rev. 607 (1958); Galvin, The "Ought" and "Is" of Oil and Gas Taxation, 73 Harv.L.Rev. 1441 (1960); McClure, Recent Developments and Trends in Oil and Gas, 8th Ann.Inst. on Oil and Gas Tax (SW. Legal Fdn. 1957) 449; Stroud, New Natural Resources Regulations, 8th Ann. Inst. on Oil and Gas Tax (SW. Legal Fdn. 1957) 393; Penick, Developments in oil and Gas Taxation 7th Ann.Inst. on Minn.Law (L.S.U.1960) 72; Winstead, Carrier Interest and Net Profit Interest, 2nd Ann.Inst. on Oil and Gas Tax (SW. Legal Fdn. 1951) 547; Peck, Recent De-

velopments in Oil and Gas Taxation, 10th Ann.Inst. on Oil and Gas Tax (SW. Legal Fdn. 1959) 421.

12. Cf. Lynch v. Alworth-Stephens Co., 1925, 267 U.S. 364, 45 S.Ct. 274, 69 L. Ed. 660.

13. Accordingly, the regulations provide: "An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in minerals in place * * * and secures, by any form of legal relationship, income derived from the extraction of the mineral * * * to which he must look for a return of his capital." U.S.Treas. Reg. § 1.611–1(b) (1).

pret Abercrombie narrowly, as indeed, the Service—prior to the instant case—has consistently interpreted it.[14]

### III.

The Commissioner makes out a prima facie case for his contention that the carried interest transaction was a loan.[15] One of the three Weinert-Lehman instruments is termed a "Loan Agreement". The agreements refer to Lehman's "loans and advances". Weinert remained personally liable under the unitization agreement to pay his share of development costs and cycling plant costs; the discharge of this obligation through Lehman's advances was an economic benefit to Weinert. The income from mortgaged or pledged property belongs to the mortgagor or pledgor. Weinert's assignment of his retained interest to a trustee cannot be distinguished from the security transactions in Abercrombie and Prater.

This contention ignores the fact that oil and gas deals have their own eccentric orbit. A carried interest transaction or a carved out production payment may take the form of a loan with assignment by way of security, but it is a lending arrangement that would have been unfamiliar to Sir Edward Coke or William Blackstone. Its characteristics are so unlike a conventional loan that for modern tax purposes it should not be treated as loans are traditionally treated. Such a sharing arrangement reallocates, temporarily, the benefits and burdens of developing and operating an oil lease which otherwise would be borne equally by two lessees each having an undivided half interest; for the term of the carry the carrying party has all of the burdens and the economic interest in the minerals. Such a transaction is in fact a sharing arrangement, not a loan.

A. The parties did not treat the transaction as a loan. Lehman did not require nor did Weinert sign any notes or evidences of indebtedness. In his tax returns, Weinert claimed no deduction for interest. He claimed no deductions for intangible drilling costs or for depreciation on equipment or for any costs

14. The Service first filed a non-acquiescence to Abercrombie, 1946–2 Cum. Bull. 6, then later withdrew the non-acquiescence, 1949–1 Cum.Bull. 1. The policy adopted in GCM 22730, 1941–1 Cum.Bull. 214 and GCM 24849, 1946–1 Cum.Bull. 66 embodies the Manahan-Herndon approach. "[Notwithstanding Abercrombie] the administrative practice continued to sanction taxpayers' rulings that during the payout period the share of income attributable to the carried interest was taxable solely to the operator. Indeed, the opposition of the Service to the Abercrombie case continues unabated. Down to the present date the administrative practice considers that during the payout period the carried interest does not have an economic interest in that portion of the production attributable to the carried interest." Hambrick, A New Look at Carried Interest, 10th Ann.Tulane Tax Inst. 304, 309 (1961). "[The Service] ultimately withdrew its non-acquiescence, but in practice the application of Abercrombie was limited so far as practicable to cases which were on all fours with it—that is, situations where a party was carried for the life of the property." Bullion, A New

Look at Tax Aspects of Oil and Gas Sharing Arrangements, 8th Ann.Inst. on Oil and Gas Taxation (SW. Legal Fdn. 1957). "Indeed, from all indications, it would not be surprising if the Service were to refuse to apply the Abercrombie principle to an exactly similar factual situation unless the taxpayer's name were also J. S. Abercrombie Co." Peck, Recent Developments in Oil and Gas Taxation, 10th Ann.Inst. on Oil and Gas Tax (SW. Legal Fdn. 1959) 421.

15. The Commissioner asserts that the only real question is, when did Weinert receive income in relation to the assignment made to secure repayment of their loan from Lehman. The Commissioner argues that Weinert realized taxable income at the time the assigned interest produced the income paid over to Lehman in repayment of the loan. The taxpayer argues that if the transaction was a loan and if Lake is applicable, the taxable income to the assignor was realized when Lehman paid the consideration for the right to receive the future income and not when Lehman, as assignor, collected the future income. We do not reach this question.

paid by the advances. There was no debtor-creditor relationship in the ordinary sense: Weinert was not personally liable for Lehman's advances; the property to be developed was liable, and then only if and when there should be net profits from its development. Lehman, owning 50 per cent of the property, assumed 100 per cent of the risk. There is nothing in the record to show how speculative the venture was but, considering the risks involved in developing even proven fields, the interest rate of only two per cent is an additional indication that the parties did not regard the transaction as a loan.

In a conventional loan or mortgage the borrower retains title to the property mortgaged or pledged and is entitled to the income from such property. He retains the economic interest in the mortgaged property. This is not true of transactions where the carrying party is repaid only from mineral production. Thus, the three concurring judges in the instant case observed: "[They] thought it well settled that, where an individual's right of recovery extends only to the mineral production, he is the owner of an economic interest in the minerals in place and is taxable on the income allocable to that interest and is likewise entitled to an allowance for percentage depletion." This principle, as Judge Train pointed out in the concurring opinion, is tied in with the allowance of depletion when capital is subject to the risk of mineral development: "If the advancer of monies can look only to mineral production for his recovery of those monies then his capital is at the risk of that mineral production and he is entitled to percentage depletion. Moreover, while it is true that the 'economic interest' question arises with regard to the allocation of the right to percentage depletion rather than to the allocation of income proper, certainly the two issues are inseparable in the field of oil and gas taxation and the one must follow the other." Instead of a conventional common law loan, therefore, we have a transfer from Weinert to Lehman of the economic interest in the

oil and gas in place for the limited term of the carry, with Lehman's advances pledged to development of the property, to the advantage of both parties.

B. In Abercrombie, unhonored by the Tax Court but loudly sung by the Commissioner, the owners of an oil and gas lease retained legal title but assigned a portion of their working interest for the life of the property, reserving to themselves a one-sixteenth share of the net profits. They irrevocably relinquished joint operator status. The carrying parties were to advance all necessary costs of development and operation, which were recoverable from the production attributable to the carried party's retained one-sixteenth interest. This Court said, "The economic reality of the transaction was that the assigning co-owners mortgaged their interest to their operating co-owner." On the "fundamental principle that income is taxable to the owner of the property producing it", and relying on the fact that the carried parties retained legal title to the carried working interest, this Court held that the income attributable to the carried parties' interest was taxable to the carried parties and the carrying party was entitled to exclude that portion of the production income from his gross income.

In Prater this Court followed Abercrombie to its logical conclusion and allowed the carried party to deduct his attributive one-fourth share of the costs of development and operation. The Court said: "If one has an economic interest in oil in place, neither the fact, that that interest is pledged to secure the return of advances made on his account by others, nor the fact, that the owner is not personally liable for the repayment of the advances, changes the legal situation as to the ownership of the interest and the income and the right to deduct the expenses attributable to his share." In Prater the carried party did not make an assignment of the mineral interest. At all times he remained the owner of his one-fourth working interest, subject to the right of the carrying party to the entire production until all expenses for

development and operation had been recovered. The carried parties resorted to outside financing; Prater was required to join in a deed of trust securing the loans for development. Thus, although not personally liable, his reversionary interest was subject to a lien.

Wood v. Commissioner, 1958, 31 T.C. 528, reversed 5 Cir., 1960, 274 F.2d 268, may be considered as involving a carried interest by operation of law. On principle, it is at odds with Abercrombie and Prater. In Wood the taxpayer, a divorced wife received, in accordance with the divorce decree, a one-half interest in oil and gas properties, formerly held in community, which were subject to certain community debts. She was not, however, personally liable for the debts. Before the divorce, production proceeds had been assigned to secure and liquidate the debts. A lower state court had held that the wife had "only a reversionary interest" in the minerals. In effect, the wife was a carried party. The question was whether the income used to satisfy the community debts before she received her share of the community was taxable to her. This Court held that the wife was not taxable until all the community debts were paid. The opinion does not refer to economic interest, and the holding may be considered a narrow one based on the local court decision that the wife had only a reversionary interest. But there is a clear analogy between the wife's interest and a carried interest, and the effect of the decision is to reject the Abercrombie approach. It is significant that the dissenting judge, in Wood,

who was the organ of the Court in Prater, characterized the arrangement as "a typical Abercrombie situation". The Tax Court concluded that the lower state court had not decided the question of title to the property, that the wife had a present interest in the property and that, to the extent her indebtedness was discharged, she realized income. But the Tax Court took pains to say: "If the right of recovery had extended solely to the oil production, the Withers Estate would have held the economic interest in the 45 per cent interest of the community estate, and would receive ordinary income from that interest as long as the receipts were applied to its advances. Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324.[16]

The decisions in Prater and Abercrombie rest on the assignors' retention of title to the interest out of which the carried expenses were to be paid. Unlike Prater and Abercrombie, Weinert did not retain title to the mineral interest. True, he transferred it to a trustee, but title might never be reassigned to Weinert; and it could be reassigned only after the pay-out. Moreover, the agreement required Lehman's signature as well as the trustee's to any reassignment to Weinert. For all practical purposes, Weinert's assignment to the trustee with a right to reassignment after pay-out is equivalent to a carried party's assignment to a carrying party with the right of reverter. The instant case, therefore, is closer to Manahan [17] and to Herndon than to Abercrombie and to Prater.

16. This language proved to be a stumbling block to the majority of the Tax Court in the instant case. The majority considered that its opinion in Wood was not inconsistent and that the language quoted in the text "was not necessary to the conclusion in that case". Of course, in a carried interest transaction, the carrying party has the present economic interest in the minerals.

17. The Proposed Regulations covering oil and gas, 26 C.F.R. Sec. 1.612–4(a) (2) incorporate the Manahan rule, recognizing the carrying party as having the

whole operating mineral during the pay-out. The facts assumed in Example (4) of the regulations seem indistinguishable from the facts of the instant case:

"L, a lessee, assigns an undivided one-half of his interest in an oil and gas lease to O who obligates himself to drill, equip, and operate the well thereon at his own cost and expense with the right to take all of the oil and gas (after royalties and production payments) until complete payout; thereafter each party is to assume his proportionate burden and receive his share of the oil and gas or the proceeds thereof. O has the

The Tax Court distinguished Manahan and Prater [18] on the ground that in most cases there was "nothing to indicate that the taxpayer was simply loaning or advancing funds for the assignor". The transactions here and in Manahan, however, as we see them were essentially similar. In Manahan the carried party assigned his working interest to the carrying party, subject to a right of reversion to an undivided one-half interest in the lease after the carrying party recouped his advances for costs of development and operation of the property. If these costs could never be recouped, title would never be reassigned to the carried party. The Herndon type of carried interest situation is somewhat similar to the Manahan type, although with different tax effects. In Herndon the owner of the working interest assigned to the carrying party an undivided one-half interest in the lease and oil payment or production payment out of the remaining half interest equal to the development costs attributable to the carried party's retained working interest plus operating costs during the pay-out. In both Manahan and Herndon the carrying party was considered as having an economic interest in that portion of the lease from which he was to recoup development costs; costs were recoverable by depletion and the carrying party was charged with the income from the carried interest. Since the production payment in Herndon was devoted to the development of the property out of which it was carved, as in the instant case, the carried party realized no income on the assignment and was not taxable on the runs accruing to the payment.

Although the Internal Revenue Service acquiesced in Abercrombie, it continued to follow Manahan and Herndon, apparently restricting application of the Abercrombie rule to a few cases squarely on all fours with Abercrombie.[19]

The critical facts in Ortiz Oil Co. v. Commissioner, 5 Cir., 1939, 102 F.2d 508, 509, are substantially similar to the facts here. Ortiz Oil Co. needed funds to obtain certain leases. It obtained the funds from Westbrook and Thompson and agreed to give them a specified proportion of the oil production up to a stipulated dollar amount. In some respects the case is stronger than the instant case: the taxpayer treated the transaction as a loan, considered that the company owned the oil production, and claimed a tax deduction for interest on the amount of the "loan". This Court, holding that the transaction was not a loan but a con-

whole operating interest throughout the complete payout period, and therefore, may expense the entire amount of the intangible drilling and development costs, provided he has properly exercised his option to do so."

18. At the time the Tax Court decided Weinert, this Court had not decided Prater. In Prater, 1958, 30 T.C. 1262, the Tax Court held that the "economic realities" were that, as to the carry, the carrying party had the economic interest in the oil and gas in place. In 1959, Weinert, 31 T.C. 928 the Tax Court said: "The facts in this case distinguish it from Carl A. Prater * * * wherein there was no semblance of a loan to petitioner." When Prater came up before this Court, the Commissioner concentrated his argument on the point that there can be no deduction by the carried party for expenses "paid or incurred" which are in excess of income during a taxable year, especially with a cash basis taxpayer who might never have to pay costs (if there should be no production).

Hambrick notes that in Prater the operators borrowed the money to develop the leases. Prater joined in a deed of trust securing the development loans. "In the typical 'investor-oil man' arrangement, the investor is the operator party and uses his own funds for drilling costs, without resort to loans from outside sources. The 'oil man' gets his leasehold interest after the investor is paid-out. Therefore, there is at least a factual pattern that does not lend itself as easily to the security arrangement analysis as the Prater situation." Hambrick, A New Look at the Carried Interest, 10th Ann.Tul.Tax Inst. 304, 312 (1961).

19. See footnote 14.

veyance of a portion of the oil produced, said:

> "The petitioner oil company treated the Westbrook and Thompson transaction as a loan. * * * The money furnished by Westbrook and Thompson was not a loan. It was the cash consideration for a conveyance of stipulated proportions of oil production to the extent in value of $359,333.34, if, as, and when the oil was produced. The portions of production specified belonged to and constituted property of Westbrook and Thompson and the petitioner was only obligated to pay over and account to them when and if the oil was produced. If no oil was produced Westbrook and Thompson got nothing and Ortiz Oil Company was under no obligation to pay them anything."

The Weinert-Lehman sharing arrangement differs from the usual carried interest in that here (1) the carry relates in part to non-mineral producing activities (the fractionation process of the cycling plant), (2) Weinert assigned the mineral interest assigned to a trustee, rather than to the carrying party with a right of reversion, and (3) Weinert continued liable for his pro rata share under the unitization agreement. It differs from the usual carve-out for development in that here there is a conveyance of mineral interest (although to a trustee) and not just an assignment of a share of future production. But we need not characterize it either as a modified carried interest or as a production payment; both transactions accomplish the same result and have the same tax consequences.[20] In either type of arrangement, as in the Weinert-Lehman transaction, the vital point is that the development burden is redistributed and the production income is reallocated: the particular production income in question is diverted from one owner of the operating interest to another in exchange for contributions dedicated and used to developing the property. Since the carried interest and the production payment are acquired for development, the effect of either transaction is to establish such a direct relation of the risk capital to the minerals as to qualify the carried interest or carved out production share as an economic interest to the oil and gas in place.

C. The Commissioner relies on Abercrombie and Prater, carried interest cases, in arguing that the transaction was a loan. He takes the broad position, under Lake, an oil payment case, that when the owner of a leasehold carves out a lesser interest and transfers it to another the consideration is taxable as ordinary income received for the assignment of future income; he cites Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 and Harrison v. Schaffner, 1941, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055.

The flaw in the Commissioner's argument is that the consideration for such an assignment does not become taxable income to the assignor, if the money received is pledged to the development of

---

20. GCM 22730, 1941–1 Cum.Bull. 214, 224 states: " * * * In cases where after recoupment of such charges or so-called advances to the 'carried interest,' the interest ceases to be a 'carried interest' and the owner thereof becomes entitled to a share in the oil, or the gross income therefrom, and liable for his share of costs and expenses, he should be regarded as retaining under the contract an economic interest in oil in place, consisting of his undivided interest in the lease *less the right of recoupment, which is comparable to an oil payment right, carved out of his fractional working interest.*" (Emphasis supplied.) Cf. "Therefore, on the vital question of division of income, whether a transaction represents a carved-out production payment in consideration of a valuable contribution to location, exploration, or development of an oil or gas deposit, or a carried interest arrangement for such purposes, the result is the same. In either event taxation of the production income and the depletion allowance follows the allocation or reallocation as agreed by the parties." Hambrick, A New Look at the Carried Interest 10th Ann.Tul.Tax Inst. 304, 343 (1961).

the oil and gas property out of which the payment is carved. The reason for this exception to the general rule is that the pledged development expenses are used to bring in production, thereby involving a capital risk. In the language of GCM 22730, the assignee is taxable on the proceeds received from the production because he has made "an investment representing an addition to the reservoir of capital investments in the oil and gas in place", while the assignor has not "parted with a capital asset, and the investments involved are not his investments". GCM 24894, 1946–1 Cum.Bull. 66, supplemented by I.T. 4003, 1950–1 Cum. Bull. 10, expressly recognized that a carved out oil payment for cash, as was the oil payment in Lake, must be treated differently from an oil payment in return for cash pledged to development. In Lake the Supreme Court referred to I.T. 4003 with approval, 356 U.S. 260, footnote 5, 78 S.Ct. 691, 695, 2 L.Ed.2d 743:

"It is, therefore, the present position of the Bureau that the assignment of any in-oil payment right *(not pledged for development)*, which extends over a period less than the life of the depletable property interest from which it is carved, is essentially the assignment of expected income from such property interest." (Emphasis supplied.)

In the sense in which the Commissioner refers to Helvering v. Horst and analogous cases, the transfer of every piece of property is only an assignment of a right to future income from that property.

This Court has held that when a drilling contractor acquired an oil payment in consideration for providing drilling services, he has made a capital investment and is entitled to depletion. Commissioner of Internal Revenue v. Rowan Drilling Co., 5 Cir., 130 F.2d 62. It would follow, of course, that the assignor did not realize taxable income either when the investment was made or when it was recouped. In Trans-California Oil Co., Ltd. v. Commissioner, 1938, 37 B.T. A. 119, royalty interests were assigned for money used to finance drilling operations. The Board of Tax Appeals held that the assignor was not taxable, since he received the money subject to an implied trust that it be used for drilling operations. As the Board pointed out in Laster v. Commissioner, 1940, 43 B.T.A. 159; acq. 1941–1 Cum.Bull. 7, reversed on other grounds, 5 Cir., 1942, 128 F.2d 4: "The lessees here received nothing more than completed wells, the cost of which constituted an investment of a third party for a right to share in the production. The wells no doubt enhanced the value of the lease, but as we held in effect in Trans-California Oil Co., supra, that fact alone does not make the transaction taxable."

Summarizing this phase of the case, Weinert did not mortgage his unassigned mineral interest or subject it to a lien as security for a loan, as in Abercrombie and Prater. He did not sell an oil payment for cash unpledged for development, as in Lake. He assigned the entire operating interest to Lehman, one-half directly and one-half indirectly, the benefits from which were dependent on Lehman's taking advantage of the opportunity to develop the property. This opportunity of converting a right to develop the possibility of oil into property is the only ownership of minerals that has tax significance; bare ownership in place of minerals 12,000 feet underground, or perhaps not there at all, or if there perhaps not exploitable, has little if any real meaning—or should have little meaning for income tax purposes. It is the development of this opportunity into producing wells having a present economic usefulness that results in income values. That is the teaching of Palmer v. Bender. During the term of the carry (or the production payment) Lehman received the full economic value incident to the mineral interest in the leases; Lehman, not Weinert, was taxable therefore on all of the production attributable to the interest in the leasehold. The effect of our holding is to gear in-

come to receipts and deductions to expenditures.[21]

IV.

The Commissioner argues, and the three concurring judges on the Tax Court held, that Lehman's right of recoupment was not an economic interest in the minerals in place, and that the revenues realized from the production payment-carried interest were taxable to Weinert. This argument rests on the contention that Lehman did not look solely to extraction and sale of the minerals for a return of his investment, but looked also for repayment to the net profits from the cycling plant; such profits were income from manufacturing not income from production. The Commissioner relies on Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 and Scofield v. LaGloria Oil and Gas Co., 5 Cir., 1959, 268 F.2d 669.

In Anderson a company owning royalty interests, fee interests, and deferred oil payments in certain properties conveyed them to the taxpayers, Anderson and others, for $150,000 cash and $110,-000 payable out of proceeds from production and from sales of fee title to the land conveyed. The question was whether the gross proceeds from the properties, used to pay the unpaid balance of $110,-000 were includible in the income of the taxpayers. Did the owner retain an investment in the oil in place to the extent of $110,000, as in Thomas v. Perkins, 1937, 301 U.S. 665, 57 S.Ct. 911, 81 L.Ed. 1324, where an oil payment, reserved upon an assignment of mineral interests, payable solely from production was held to be an economic interest? Or did he make an outright sale of his interest for cash? The Supreme Court said: "By an outright sale of his interest for cash, such an owner converts the form of his capital investment, severs his connection with the production of oil and gas and the income derived from production, and this renders inapplicable to his situation the reasons for the depletion allowance." 310 U.S. at 404.* The Court held that deferred payments reserved by the owner company must be treated as payments received upon a sale to the taxpayers, and not as income derived from the consumption of its capital investment in the reserves through severance of oil and gas. The basic issue in Anderson was whether the owner had made an outright sale or had made a lease, retaining an economic interest in production, as in Thomas v. Perkins where an oil payment had been reserved upon an assignment of oil and gas interests. Here, there is no question of a lease or sale. Lehman did not sever his interest in the property; he acquired an interest in the property through an investment pledged to development. The alternative source of income in Anderson was the sale of the surface fee, something having no necessary relation to the mineral interest. Here, Lehman had to recoup solely from the extraction and sale of the minerals.

LaGloria, holding that the gas processing plant owner lacked a depletable economic interest, is distinguishable from the present case.[22] LaGloria was merely

21. Cf. Prater the tax effect of which is to allow the carried party to deduct expenses he has not paid, for which he is not liable, which his so-called "creditor" (the carrying party) may never recoup.

* 60 S.Ct. at 954.

22. LaGloria obtained rights to process natural gas from lease owners under three contracts, in consideration for which LaGloria obligated itself to construct certain facilities (including an extraction plan), to drill a specified number of wells, to deliver to the lease owners a specified percentage of plant products, and to return the residue gas to the producing formations. But the leasehold owners were to own the wells, casing equipment, and top well connections and were to have full and complete control of the operation of the wells. LaGloria performed its obligations under the contracts, spending approximately $5,452,000, and contended that this money constituted a capital investment in the minerals in place entitling it to a deduction from gross income for depletion of its interest. The proceeds from the sale of gas extracted from the units outside the LaGloria Field area constituted

the plant owner and, as the court went to great lengths to emphasize, was a "stranger to the leases".[23] LaGloria purchased only a share of the liquid products to be produced without acquiring any interest in the leases themselves; the granting clause referred merely to "all gas to be produced" and not minerals in place; in effect, the Court treated LaGloria's investment as an investment in the plant. Unlike LaGloria, Lehman owned fifty per cent of the leasehold interest, a production payment right in the other fifty per cent, and during the pay-out had the right of a lease owner to Weinert's share.

Here, the plant was not a separate manufacturing plant or business, but an indispensable part of the severance and sale of the gas and liquid hydro-carbons produced from the unitized leases. The operation of the plant was nothing more than the extraction of the liquid hydrocarbons from the gas produced from the unitized leases and the return of such dry gas as was not sold into the geological formation from which it was produced.

The Commissioner argues that Lehman did not possess an economic interest, since the revenues from the plant represented processing of mineral production from leases other than those covered by the unitization agreement. This argument rests on a finding of the Tax Court that is not supported by the record.[24] The only basis for the finding is a statement in the "Agreement for the Processing of Unitized Substances" that if the plant capacity cannot be fulfilled from unitized production, then the plant operator may use the excess capacity to process production from sources of supply outside of the unitized lands. According to the record, however, this never occurred. The income during the taxable periods came only from production from the unitized leases.

In LaGloria the majority and minority of the Court agreed that the processes of separation and absorption are producing activities while fractionation is a refining or manufacturing activity.[25] It seems unreasonable to say that merely because the carrying party receives the

20 per cent of LaGloria's gross income. Since LaGloria reserved no right to control the operation of the wells, and looked to outside properties to recoup its investment, this Court held that LaGloria did not acquire by investment any interest in the minerals in place, and hence had no economic interest in minerals entitling it to a deduction for depletion. Scofield v. LaGloria Oil & Gas Co., 5 Cir., 1959, 268 F.2d 699, certiorari denied 1960, 361 U.S. 933, 80 S.Ct. 372, 4 L.Ed.2d 354. See Note, 14 SW.L.J. 420 (1960).

23. "Here, for purposes doubtless satisfactory to themselves, the lease owners did not make subleases or grant legal or equitable interests to LaGloria. They carefully delineated LaGloria's rights as entitling it to all the heavier hydrocarbons *to be produced* and as entitling it to take delivery at the well head. LaGloria is therefore a stranger to the fee and the leaseholds. It builds a plant essential to the commercial enjoyment of the lease owners of the gas in place, but it did not look to the extraction of minerals from the flow of gas from any single producing property for recoupment of its large investment. Its fortunes did not rise and fall in the same way as

did the lease owners when new reservoirs were discovered or when the reservoir ran dry." 268 F.2d 699, at page 709.

24. The statement that the agreements contemplated the processing of production from leases other than the unitized leases is contrary to the findings:

"[The parties] joined in an agreement to construct and operate a plant to process unitized substances produced and saved from the two units, the percentage of undivided ownership of each of the parties in the plant to be determined by the ratio of the acre feet of effective sand contributed by each to the acre feet of effective sand contributed by all the parties. * * * The recycling and processing plant was designed to process the unitized substances and casinghead gas produced and saved from the unitized area and to return residue gas into the formation from which produced, less such residue gas as might be sold to others at the plant."

25. The three processes applied by the cycling plant to the wet gas stream were separation, absorption, and fractionation. The majority in LaGloria stated: "The extraction of heavier hydrocarbons both at the separator and at the absorber re-

cycling plant income rights of the carried party in addition to mineral production (leasehold) rights, and merely because one of the processes included fractionation, that the entire character of the leasehold rights as an economic interest is destroyed.[26] The arrangement here was predominantly concerned with mineral production and recoupment was recoverable solely from extraction and sale of the minerals. The economic interest doctrine, historically applied to depletion, should not be given such a rigid and literal interpretation in cases concerning carried interest arrangements or production payments as to deny the existence of an economic interest when the investor looks to the minerals for recovery of his risk capital. Until recoupment, Lehman had the same economic interest any lease owner would have in a lease subject to a unitization agreement. By making a significant contribution to the development of the minerals he acquired by investment an interest in the minerals in place and looked to extraction of the minerals for the return of this investment. If Lehman had no economic interest in the production, no one had.

Processing plants may be required under state law[27] and are as indispensable to the production of gas as the upland drilling sites were indispensable to the production of oil in Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347. To hold that Lehman did not possess an economic interest would be tantamount to holding that the owner of a working interest or any lease owner would lose his right to depletion whenever a cycling plant is needed to process gas. The Law may be a jealous mistress; it is not a fussy old maid.

Viewing the Lehman-Weinert sharing arrangement not as a loan but as a Manahan-Herndon carried interest transaction or as a carved out production payment for development during the pay-out, Lehman had an interest in the minerals in place: his advances were used to pay the costs of drilling wells and building a plant necessary for processing the minerals. Unlike LaGloria, Lehman's investment was in the minerals, not the plant. Unlike Anderson, Lehman's recovery of the investment was solely dependent on the extraction and sale of the minerals, not on an alternative source such as surface rights unrelated to minerals. Since however, production includes the processes of separation and absorption but not fractionation, to be consistent with La-Gloria the return on the investment should be apportioned to reflect the amount solely attributable to production. Accordingly, the case is reversed and remanded for proceedings not inconsistent with this opinion, the parties to be permitted to introduce evidence showing the proper apportionment of the revenues from the plant so as to reflect the net profits from production as distinguished from fractionation.

The judgment is

Reversed and remanded.

CAMERON, Circuit Judge, concurs in the result.

---

sults from mechanical and heat processes which do not change the chemical structure of the gas. In a sense, therefore, since the gas, after losing some six per cent of its content, is then returned to the ground there is production of the heavier hydrocarbons in the plant of the taxpayer." 268 F.2d 699, at 708. Judge Brown, dissenting, agreed with the majority on this point. 268 F.2d at 726.

26. There have been many qualifications to the Anderson rule, as for example, anticipatory depletion, and even more obviously, recognition that rights to share in the net profits of production may constitute an economic interest. Commis-

sioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347; Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062. See Jackson, Federal Income Tax Problems Involved in Typical Oil and Gas Transactions in Texas; 25 Texas L.Rev. 343, 365 (1947); Sneed, The Economic Interest—An Expanding Concept, 35 Texas L.Rev. 2739, 2759-66 (1957). In all cases, however, the source of return is predominantly production and sale of minerals, which is the situation here.

27. See Vernon's Tex.Rev.Civ.Stat.Ann. Art. 6008 (1949).