DIXIE FINANCE COMPANY, INC.,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

EMPIRE MORTGAGE & INVESTMENT
CO., Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

Ernest STEWART and Harriet B.
Stewart et al., Petitioners-
Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

Nos. 72–1417, 72–1509 and 71–3602.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1973.

E. Michael Masinter, Kent E. Mast, Atlanta, Ga., for Dixie Finance Co., Inc.

John W. Stokes, Jr., U. S. Atty., Julian M. Longley, Jr., Asst. U. S. Atty., Atlanta, Ga., Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Gordon S. Gilman, Attys., Tax Div., Dept. of Justice, Washington, D. C., for the United States.

Edward R. Kane, Atlanta, Ga., for Empire Mortgage & Investment Co.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Atty., Tax Div., U. S. Dept. of Justice, Lee H. Henkel, Jr., Acting Chief Counsel, Bobby D. Burns, Gordon S. Gilman, Attys., Internal Revenue Service, Washington, D. C., for United States.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Gordon Gilman, Attys., Tax Div., Dept. of Justice, K. Martin Worthy, Chief Counsel, Chris J. Ray, Internal Revenue Service, Washington, D. C., for C. I. R.

Edward R. Kane, Atlanta, Ga., for Stewart.

Joseph B. Brennan, Atlanta, Ga., for Whitehurst and others.

Before MORGAN, CLARK and INGRAHAM, Circuit Judges.

CLARK, Circuit Judge:

These three appeals (one from the district court and two from the Tax Court) arise from two separate purchases by Dixie Finance Co., Inc., [Dixie] of the stock of small loan companies. All three appeals involve the same question—the proper allocation of the price paid to the stockholders between that which was paid for their stock and that which was paid for agreements not to compete. Since Dixie made the separate purchases from unrelated sellers, the facts of each transaction are set out separately.

*The Empire Transaction*

Dixie agreed to purchase from Empire Mortgage & Investment Co. [Empire] the capital stock of its four loan company subsidiaries. In addition, Empire and its officers gave to Dixie certain covenants not to compete. The price, based upon a formula applied to the accounts receivable of the four loan companies, as determined before the sale, was 312,497.41 dollars, of which 152,952.40 dollars was allocated to the stock, and the remainder, 159,545.01 dol-

lars was allocated to the covenant not to compete and goodwill.[1] Shortly after the agreement was executed Dixie reviewed the accounts receivable of the four companies and concluded that accounts in the amount of approximately 33,000 dollars were worthless. Thereupon, Dixie began negotiations with Empire for a reduction of the purchase price by a like amount. Dixie's success in these negotiations, however, was limited, since Empire agreed to a reduction of the price only in the amount equal to one-half of the amount by which the accounts receivable were over-valued. Moreover, Empire required as the price of its consent a modification of the purchase and sale agreement so as to reduce the value formerly assigned to the covenant not to compete to no more than one dollar.

Empire, proceeding on the theory that the modified contract was controlling as to the amount paid for the covenant not to compete, did not include in its tax return for the year at issue any amount of ordinary income as proceeds from its covenant not to compete. Dixie, on the other hand, assigned on its books the amount of 159,545.01 dollars to Empire's covenant not to compete. Thus, on its income tax returns filed for the fiscal years ended March 31, 1961 through March 31, 1964, it claimed significant deductions based on the amortization of the amounts assigned to the covenant.

The Commissioner, in the separate proceedings below,[2] took the inconsistent positions that both of the taxpayers were in error, and prevailed in each. On this appeal, the Government, though it has now in effect taken the position of a stakeholder, advances as its preferred position the decision of the district court in the Dixie Finance case, which concluded that no more than one dollar should be allocated to the covenant.

### The Stewart Transaction

The second transaction, wholly separate from the Empire transaction discussed above, involved the purchase by Dixie of all of the outstanding stock of Friendly Loan Company and its subsidiaries and affiliates. The stock was purchased from a number of individuals, including Ernest Stewart. Though the total consideration paid to the stockholders was only 650,000 dollars, Dixie contends that, of this amount, 526,150 dollars was allocated by contract to the covenant not to compete. Stewart and the other selling stockholders contend, however, that the allocation of such a large amount to the covenant not to compete does not accord with economic reality. They further contend that Dixie never told the Friendly stockholders that any part of the 650,000 dollars was being paid for other than the Friendly stock, that the covenant not to compete was passed around to the stockholders for execution only after the execution of the stock purchase agreement, that most of the stockholders did not read it, and that there was no discussion of the income tax consequences of the agreement not to compete.

As in the Empire transaction, Dixie amortized that amount which was allocated under its construction of the contract to the covenant not to compete, thus receiving a deduction for income tax purposes. Stewart and the other selling shareholders, on the other hand, reported the entire proceeds of the sale as proceeds from the sale of a capital as-

---

1. The covenant not to compete agreement breaks down the total of $159,545.01 into two separate categories as follows:

| Item | Amount |
|---|---|
| Covenant not to compete | $ 51,419.17 |
| Covenant not to compete and goodwill | 108,125.29 |

The breakdown of these categories totals $159,544.46. The difference of 55 cents between this amount and the amount set forth in the sales agreement apparently results from a mathematical error.

2. Dixie chose to litigate in the District Court for the Northern District of Georgia, while Empire sought relief in the United States Tax Court.

set, and allocated no part of the sales price to the ordinary income-producing covenant.

Once again, the Government took inconsistent positions in separate proceedings,[3] and contested each taxpayer's allocation. The Government prevailed as to Dixie, since the district court found that no portion of the 650,000 dollar purchase price should be allocated to the covenant not to compete. The Government was unsuccessful in the Tax Court, however, since that court likewise found that no part of 650,000 dollars should be allocated to the covenant. Thus, Stewart and the other selling shareholders were allowed to treat the entire amount they received for the sale of the Friendly stock as the proceeds from the sale of a capital asset. Though the Government appeals from the Tax Court decision in favor of the selling shareholders, it takes the position on this appeal that the Tax Court decision should be reversed only if the judgment of the district court in the Dixie case is reversed as to this issue.

### The Merits

The Government's position, simply stated, is that while the Commissioner is not bound by the form in which the taxpayer chooses to cast his transaction, but for tax purposes may look to the substance, the taxpayer must generally accept the tax consequences which follow from the form he has chosen. Thus, the Government would bind Dixie to the terms of the modified contract with Empire which assigned not more than one dollar to the covenant not to compete and at the same time would challenge Dixie's contractual allocation as to the Stewart transaction, where the agreement recited that 526,150 dollars was paid for the covenant not to compete. Of course, under a strict interpretation of its theory, the Government could also attempt to hold Stewart and the other

selling shareholders to the allocation of 526,150 dollars by urging the reversal of the Tax Court decision without regard to this court's decision as to Dixie, but it chooses not to do so reasoning that it only seeks to prevail on one construction of each transaction. Similarly, the Government has used its prerogative to successfully challenge the contractual allocation as to Empire in the Tax Court, but is now willing for its victory in that forum to be reversed if this court will affirm its success over Dixie in the district court.

■ Initially, we note our agreement with the first half of the Commissioner's statement of the applicable law. The parties cannot contractually preclude the Commissioner from attacking an allocation which has no basis in economic reality. *See, e.g.,* Comm'r v. Court Holding Co., 324 U.S. 331, 65 S. Ct. 707, 89 L.Ed. 981 (1945); Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Redwing Carriers, Inc. v. Tomlinson, 399 F.2d 652 (5th Cir. 1968); Schulz v. Comm'r, 294 F.2d 52 (9th Cir. 1961).

■ The district court in the Dixie case found that there was no substantial economic basis for the allocation of 526,150 dollars to the Stewart, et al. (Friendly) covenant not to compete. The following more-than-sufficient evidence was presented to support this finding. The consideration for the alleged non-competition agreement was distributed to the stockholders in proportion to their stock holdings. No extra consideration was given to those persons whose competition would be expected to have the most adverse effect on Dixie Finance; indeed, two stockholders who had refused to sign the noncompetition document were paid on the same basis as those who signed. There was no effort to police the agreement to insure that Dixie received the benefit contracted for. While the amount allocated to

---

3. Stewart and the other selling shareholders raised their contentions in consolidated proceedings in the United States Tax Court. As stated in *n.* 2 above, Dixie litigated in the District Court.

the covenant was far in excess of any reasonable value which the covenant might have to Dixie, the amount allocated to stock purchase was less than its fair market value. The court further found that there was no evidence in the record to support its restructuring of the covenant in any smaller amount. On the basis of this clear showing that the contractual allocation had no basis in economic reality, we affirm the determination of the district court in Dixie's case that no part of the 650,000 dollars should be allocated to the Stewart, et al. covenant not to compete.

■ On the same reasoning we also affirm the decision in the case of Stewart, et al. which refused to allocate any part of the 650,000 dollars to the value of the "covenant" given by Stewart and the other selling shareholders. In addition we would note that the Tax Court's decision on the merits in the Stewart, et al. case is consonant with this court's decisions in Barran v. Comm'r, 334 F.2d 58 (5th Cir. 1964), and Balthrope v. Comm'r, 356 F.2d 28 (5th Cir. 1966).[4]

■ We also accept as substantially correct the Commissioner's statement of the second half of the rule as to the tax consequences of contractual obligations—the taxpayer must generally accept the tax consequences which follow from the form he has chosen. This court has said that "when parties to this type of transaction specifically contract for the covenants and give them an assigned value, strong proof must be adduced to overcome the declaration." Barran v. Comm'r, *supra,* 334 F.2d at 63; Balthrope v. Comm'r, *supra,* 356 F.2d at 32. In this case it is uncontradicted that Dixie and the Empire stockholders in arms-length dealings allocated, 51,419.17 dollars to a covenant not to compete and 108,125.29 dollars to "covenant not to compete and goodwill." The complicating factor is that eight months later that agreement was amended so that not more than one dollar was allocated to the covenant not to compete.

■ In this situation where the parties have expressed not one but two different allocations, how is one to be chosen over the other? This court opts for that allocation which most truly reflects the intention of the parties in an arms-length, good faith bargaining situation. Here there is no showing that the initial bargain was a subterfuge nor is it shown that any event occurred in the eight-month interval between the execution of the agreement and its modification which would have reduced the initial value of the covenant to virtually nothing. The modification, as found by the Tax Court in the Empire case, was no more than "an afterthought and a sham and bears no relationship to the realities or substance of the situation." Moreover, the contemporaneous allocation of the purchase price seems to be more nearly in accord with economic reality. The only evidence adduced to support the district court's conclusion that the parties' agreement allocating 51,419.17 dollars to the covenant was unrealistic is the later modification of that agreement. We have already rejected the basis for this *post hoc* reasoning. The district court erred in rejecting Dixie's claim based on the original contractual allocation of 51,419.17 dollars.

■ This court must also resolve the ambiguity which the parties constructed into their original document.

4. For the purpose of this decision we need not decide whether the decision in Comm'r v. Danielson, 378 F.2d 771 (3d Cir.), cert. denied 389 U.S. 358, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), is consistent with the decisions of this court in *Barran* and *Balthrope, supra. Danielson* holds that a party to an agreement fixing an explicit amount for the covenant not to compete may not attack the agreement "absent proof of the type which would negate it in an action between the parties." 378 F.2d at 775. The Tax Court found that the agreement in this case did not constitute an enforceable contract not to compete.

In addition to the 51,419.17 dollars allocated to the covenant not to compete, 108,125.29 dollars was allocated to "covenant not to compete and goodwill." [5] Though Dixie has succeeded in showing that the district court was in error in concluding that the allocation of 51,419.-17 dollars to the covenant had no basis in fact, it has made no such showing that the court was in error as to the claimed 108,125.29. On this appeal Dixie has not attempted to meet its burden of breaking this lump sum down into its separate component parts, nor has it shown why two allocations were made to a single covenant not to compete. We affirm the district court's decision that no part of the 108,125.29 is allocable to any covenant not to compete.

It follows from the discussion above that the Tax Court's determination that Empire received 51,419.17 dollars for the covenant not to compete should likewise be affirmed.

Our reversal in part of the district court's decision as to Dixie requires that we remand the cause to that court for consideration of the other claims raised by the Government which that court found unnecessary to consider in light of its decision that Dixie take nothing.

The decision of the Tax Court appealed from in Ernest Stewart v. Comm'r, No. 72–3602, is affirmed.

The decision of the Tax Court appealed from in Empire Mortgage Co. v. Comm'r, No. 72–1509, is affirmed.

The decision of the District Court for the Northern District of Georgia appealed from in Dixie Finance Co. v. United States, No. 71–1417, is affirmed in part, reversed in part, and remanded.

---

5. Goodwill is a capital asset, and amounts received therefor in excess of the seller's basis are treated as capital gains. Comm'r v. Killian, 314 F.2d 852 (5th Cir. 1963). Since the good will is deemed to have no measurable useful life, the purchaser is not allowed to amortize and deduct the purchase price of the goodwill. *See* Treasury Regulation, 26 C.F.R. § 1.167 (a)–3.