Alois M. SONNLEITNER and Mildred A. Sonnleitner, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 77–1702.

United States Court of Appeals, Fifth Circuit.

July 9, 1979.

Frank E. Magee, Portland, Or., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., Richard W. Perkins, Atty., Gilbert E. Andrews, Acting Chief, App. Section, Aaron P. Rosenfeld, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before COLEMAN, GODBOLD and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

This appeal involves the tax treatment of certain proceeds of the sale of a business

which were allocated in the purchase agreement to a covenant not to compete. Taxpayers Alois and Mildred Sonnleitner reported the proceeds as capital gains on the sale of stock.[1] The Commissioner of Internal Revenue disputed the capital gains treatment of the proceeds, and the Tax Court agreed that the proceeds should have been reported as ordinary income. We affirm the decision of the Tax Court.

On October 11, 1954, Alois Sonnleitner and Cloyce Smith as equal partners purchased a franchise from Swanson's Cookie Company[2] of Battle Creek, Michigan, which granted them the exclusive right to the production and sale of cookies under Swanson's name in Oregon and Washington.[3] From the outset of production from the plant in McMinnville, Oregon, in June 1954, the company was a financial success. While Smith managed the bakery, taxpayer assumed responsibility for sales.

On November 5, 1956, Smith and taxpayer incorporated their business under Oregon law as the Smith-Sonnleitner Cookie Company. All of the partnership assets, including the franchise agreement, were transferred to the corporation in exchange for which Smith and taxpayer each received fifty per cent of the issued capital stock. Smith and taxpayer elected themselves and their accountant, Rolland Mains, to the board of directors.[4] Smith became president and taxpayer secretary-treasurer of the corporation.

In 1962, the franchisor advised Smith and taxpayer of the availability of a franchise covering Louisiana, Oklahoma, and Texas. After Smith expressed disinterest, taxpayer and his wife acquired this franchise with its plant in Longview, Texas. The franchise agreement was virtually identical to that governing the Oregon corporation.[5]

Although taxpayer continued his duties as director, secretary-treasurer, and sales manager of the Oregon corporation, he devoted much of his time to the Texas company. Smith became upset at taxpayer for spending so much time in Texas and offered to buy out taxpayer's interest in the Oregon corporation. Both Smith and taxpayer retained lawyers to assist in the negotiations. Smith initially offered $350,000 for taxpayer's fifty per cent interest. Taxpayer refused and countered with various offers, both to buy out Smith and to sell to him.[6]

1. The purchasers, Cloyce Smith and the Oregon corporation, claimed an amortization deduction for each of the $15,000 payments attributed to the covenant not to compete. To protect the revenue, the Commissioner of Internal Revenue made deficiency assessments against the purchasers as well as the taxpayer in the instant case. The purchasers paid the deficiencies and then filed suit in the district court to challenge their legality. The proceedings in the district court have been held in abeyance pending the outcome of this case.

2. Swanson's Cookie Company assigned all of its interest to Archway Cookies, Inc., on July 2, 1962. To avoid confusion, Swanson's and Archway will be referred to as the franchisor throughout this opinion.

3. The franchise agreement provided as follows:
9. The territory in which the Bakers may conduct the business herein described shall be the entire States of Oregon and Washington, and not elsewhere.
\* \* \* \* \* \*
14. So long as the Bakers shall faithfully perform all of their duties and obligations herein contained, the Company shall not, independent of said Bakers, engage and do a

similar business anywhere within the territory described in Paragraph "9" hereof.

4. In 1956, § 57.185 of the Oregon Revised Statutes required corporations to have a minimum of three directors.

5. The franchise agreement provided in part:
5. The territory in which the Baker may conduct the business herein described shall be the entire States of Oklahoma, Texas and Louisiana, and not elsewhere.
\* \* \* \* \* \*
10. So long as the Baker shall faithfully perform all of the Baker's duties and obligations herein provided, the Company shall not, independent of said Baker, engage in or do a similar business anywhere within the territory herein granted the Baker; provided, however, that the Company reserves the right to make periodic sales of nominal quantities of said cookies and other bakery products in said territory for the purposes of protecting its trade-mark and trade name rights.

6. At one point, taxpayer offered to buy Smith's interest for $75,000 a year for the life of Smith or his wife. As late as July 12, 1967, taxpayer offered Smith $800,000 for his stock. Taxpayer

In contrast to the Oregon corporation, the Texas enterprise was a financial disaster from the outset. The plant was too small and the management poor. Creditors of the Texas company were threatening taxpayer with collection suits for overdue debts. Since Mains continued as taxpayer's financial adviser until December 1968, both Smith and Mains were aware of taxpayer's financial difficulties.

While taxpayer was in Texas for the commencement of a new plant, Smith and Mains convened a meeting of the board of directors of the Smith-Sonnleitner Cookie Company on June 13, 1967. They voted to remove taxpayer as secretary-treasurer and sales manager of the corporation and terminated his $72,000 annual salary.[7]

Both taxpayer and Smith filed lawsuits concerning control of the Oregon corporation and taxpayer's ouster. These lawsuits were dismissed by stipulation on November 22, 1968, when taxpayer, Smith, Mains, and the Oregon corporation entered into an agreement for the purchase of taxpayer's stock. The purchase agreement provided that the sales price of taxpayer's stock would be one-half of the appraised value of the corporation, minus $75,000, which was to be paid in consideration for taxpayer's covenant not to compete with the Oregon corporation. The covenant provided in part:

> In consideration of the sum of $75,000 to be paid by the corporation to Sonnleitner, Sonnleitner covenants and agrees that he will not compete directly or indirectly, either as a proprietor, partner, shareholder or a corporate officer, director or employee against the business of the corporation within its present territory consisting of the States of Oregon, Washington and Alaska at any time before January 1, 1973.

The appraised value of the corporation was $960,000. One-half of the appraised value, $480,000, minus the $75,000 allocated to the covenant not to compete established the sales price of taxpayer's stock as $405,000. Under the sales agreement, thirty per cent of the stock purchase price was payable in December 1968, with the balance payable in forty-eight monthly installments. The $75,000 allocated to the covenant not to compete was payable $15,000 per year beginning in 1968.

On their joint income tax returns for 1968, 1969 and 1970, taxpayers reported the payments received for the covenant not to compete as capital gains on the sale of stock. The Commissioner of Internal Revenue determined that the $15,000 received by taxpayers in each of the years in question represented ordinary income, not capital gain, and asserted income tax deficiencies.[8] The Tax Court, on October 15, 1976, entered its decision sustaining the Commissioner's determination that the $15,000 payments were in consideration for a covenant not to compete and, thus, taxable as ordinary income.

■ The sole issue before us is whether the proceeds of the sale of taxpayer's interest in the Smith-Sonnleitner Cookie Company allocated to the covenant not to compete represented ordinary income or capital gains. It is well settled that consideration paid for a bona fide covenant not to compete represents ordinary income to the seller, *Nelson Weaver Realty Co. v. Commissioner*, 307 F.2d 897, 904–05 (5th Cir. 1962), and an amortizable deduction to the buyer for the duration of the covenant, *Balthrope v. Commissioner*, 356 F.2d 28, 31 (5th Cir. 1966). The consideration paid for stock, however, represents a capital gain for the seller to the extent that the consideration

---

also offered to sell his interest on different terms: $1,500,000; $1,000,000; and $75,000 a year for the life of himself or his wife.

**7.** Smith had warned taxpayer before he left for Texas that he risked termination by going to Texas at this time. Taxpayer stayed in Texas longer than he had expected because of illness. When taxpayer returned to Oregon, the board

of directors convened again, with taxpayer in attendance, and ratified the decisions of the previous special meeting.

**8.** The income tax deficiencies asserted by the Commissioner were $3,441.51 for 1968, $13,846.72 for 1969, and $3,587.84 for 1970.

exceeds the seller's basis in the stock, I.R.C. §§ 1202, 1221, but yields no corresponding tax benefit to the buyer.

Taxpayer advances two arguments for treating the consideration allocated to the covenant not to compete as additional consideration for the sale of his stock. First, taxpayer argues that the covenant had no basis in economic reality other than the contrivance of a tax benefit for the purchaser. Second, taxpayer argues that the covenant is void because it was entered into under economic duress. Under the rule of *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959),[9] adopted by this court in *Barran v. Commissioner*, 334 F.2d 58, 64 (5th Cir. 1964),

> [W]hen the parties to a transaction . . . have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.

The Tax Court held that taxpayer failed to adduce "strong proof" that the covenant lacked economic reality and was entered into under economic duress. The findings of the Tax Court will not be disturbed unless they are clearly erroneous. I.R.C. § 7482(a); Fed.R.Civ.P. 52; *Christie v. Commissioner*, 410 F.2d 759 (5th Cir. 1969).

The threshold question presented by taxpayer is whether "reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961). *See Dixie Finance Co. v. United States*, 474 F.2d 501, 504 (5th Cir. 1973). Taxpayer contends that the covenant was unnecessary and unrelated to business reality for three reasons.[10]

First, taxpayer argues that covenants not to compete in the franchise agreements governing both the Oregon and the Texas companies barred him from competing with Smith. However, the provisions in the franchise agreements to which taxpayer refers merely grant the franchisees exclusive rights to manufacture and sell name brand cookies and restrict such manufacture and sales to the designated territory.[11] These putative covenants not to compete would not prohibit taxpayer from establishing a competing cookie business in Oregon.

Second, taxpayer argues that the possibility of Smith withholding the unpaid part of the stock purchase price sufficiently deterred him from competing so as to render the covenant devoid of economic reality. However, absent the covenant not to compete, Smith would have no legal basis for withholding the unpaid stock purchase price in reaction to taxpayer's competition.

Third, taxpayer argues that the covenant was unrealistic, because he lacked the ability to compete with Smith. He claims that he was financially strapped with the debts of his Texas business.[12] However, the fact

9. The Commissioner urges us to discard the *Ullman* rule and adopt the *Danielson* rule, *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967). Under the *Danielson* rule,

> [A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement will be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc.

*Id.* at 775. The *Danielson* rule imposes a heavier burden upon taxpayers challenging agreements than does the *Ullman* rule. The only court of appeals which has consistently followed the *Danielson* rule is the Third Circuit. The instant case, like *Dixie Finance Co. v. United States*, 474 F.2d 501, 505 n. 4 (5th Cir. 1973), does not compel a choice between the *Ullman* rule and the *Danielson* rule.

10. Taxpayer implies that a fourth reason that the covenant lacks economic reality is that the covenant serves no purpose other than to protect the transfer of goodwill to the purchaser. The argument is unavailing in the instant case because no goodwill was transferred by the purchase agreement. Furthermore, a seller of corporate stock does not directly own corporate goodwill. *See Balthrope v. Commissioner*, 356 F.2d 28, 32 (5th Cir. 1966).

11. See notes 3 and 5 and accompanying text *supra*.

12. Taxpayer claims that he promised his Texas creditors he would move to Texas to personally supervise the business in consideration for their forbearance from bringing collection suits for past due debts. A change of residence, in and of itself, does not establish an inability to

that taxpayer offered to buy out Smith for $800,000 in July 1967 contradicts or at least questions his assertion of financial inability to compete. He apparently contemplated full ownership of both the Oregon and Texas companies.

In his testimony before the Tax Court, taxpayer admitted that he had threatened to compete with Smith both before and after his move to Texas. As sales manager of the Oregon company for fourteen years, taxpayer certainly had the business contacts to compete with Smith. *Cf. Schulz,* 294 F.2d at 54. A further testament to taxpayer's business acumen was his recognition by the franchisor as an outstanding salesman in 1963.

In light of taxpayer's business contacts and demonstrated selling ability, as well as his threats to compete, Smith had genuine business reasons for negotiating a covenant not to compete into the purchase agreement. The Tax Court's finding that the taxpayer failed to adduce "strong proof" of the covenant's economic reality is not clearly erroneous.

■ Alternatively, taxpayer seeks to avoid the tax consequences of the covenant not to compete by arguing that he entered the covenant under economic duress. There are three essential elements to a prima facie case of economic duress: (1) wrongful acts or threats; (2) financial distress caused by the wrongful acts or threats; and (3) the absence of any reasonable alternative to the terms presented by the wrongdoer. *See generally* J. Calamari & J. Perillo, Contracts § 9–2 (2d ed. 1977).

The leading Oregon case on economic duress upon which taxpayer relies is *Capps v. Georgia Pacific Corp.,* 253 Or. 248, 453 P.2d 935 (1969). In *Capps,* the wrongful conduct alleged was the debtor's refusal to pay an acknowledged debt of $157,000. This refus-

al to pay an expected sum caused plaintiff financial distress, because the payment was intended for use in meeting a mortgage note. The plaintiff alleged that he had no reasonable alternative but to accede to the debtor's offer of $5000 in full satisfaction of the debt, because plaintiff was in danger of foreclosure on his home if he were to reject the debtor's terms.

The only similarity between the plaintiff in *Capps* and the taxpayer in the instant case is that both were in inferior bargaining positions at the time their respective contracts were entered into. While in *Capps* the plaintiff's financial distress arose out of the offeror's withholding of an acknowledged debt, taxpayer's financial distress arose out of his own misfortune rather than any wrongful act of the offeror. In *Capps,* the plaintiff had no reasonable means of avoiding the foreclosure of his home other than by accepting $5000 in full satisfaction of a $157,000 debt; taxpayer was not presented with a Hobson's choice.

Taxpayer asserts that Smith engaged in wrongful conduct by terminating his employment and salary. As president of the corporation, Smith clearly had the authority to terminate employees.[13] Neither the articles of incorporation nor the by-laws of the corporation required a showing of good cause prior to the discharge of an employee. Taxpayer's prolonged absence from Oregon would have furnished good cause had such been required.

■ It is well established that "[t]he assertion of duress must be proven by evidence that the duress resulted from defendant's wrongful and oppressive conduct and not by the plaintiff's necessities." *W. R. Grimshaw Co. v. Nevil C. Withrow Co.,* 248 F.2d 896, 904 (8th Cir. 1957). Taxpayer provoked Smith to discharge him from his duties by spending a disproportionate

---

compete. *See Commissioner v. Killian* 314 F.2d 852, 854 (5th Cir. 1963).

**13.** Likewise, the ouster of taxpayer as secretary-treasurer of the corporation was proper. Article III, § 1 of the by-laws of the Smith-Sonnleitner Cookie Company, provided in part: "All of the officers shall hold office at the

pleasure of the board . . . ." As a majority of the board of directors, Smith and Mains acted within their authority under Article III, § 4 of the by-laws, in convening a special board meeting and voting to remove taxpayer as an officer.

amount of time on his Texas business. Taxpayer's bad luck with the operation and sales of the Texas company was likewise no fault of Smith's.

The evidence presented to the Tax Court belies taxpayer's suggestion that he had no reasonable alternative but to accede to Smith's terms. The fact that taxpayer offered to buy out Smith indicates that taxpayer was not in such dire financial straits as would leave him with no option. The various offers and counter-offers indicate that there were numerous possibilities.[14] He had the opportunity to negotiate further or to refuse to sell altogether. With his lawyer's advice and with full knowledge of the tax consequences, taxpayer consented to the purchase agreement with the covenant not to compete. That taxpayer did not obtain as high a sales price as he might have liked is no cause for setting the purchase agreement aside.[15]

Taxpayer failed to produce "strong proof" that the covenant not to compete was devoid of economic reality or entered into under economic duress. Accordingly, we affirm the Tax Court's decision that the proceeds allocated to the covenant not to compete are ordinary income and hold taxpayer liable for the income tax deficiencies asserted by the Commissioner.

AFFIRMED.

---

14. Taxpayer's assertion that Smith was bound by the stock price formula in the November 5, 1956, shareholder agreement is without merit. Although the shareholder agreement gave each shareholder the right of first refusal should either die or contemplate the transfer of stock to another, the agreement did not preclude the shareholders from negotiating a stock purchase price under other circumstances.

15. Taxpayer did succeed in obtaining $55,000 more for the stock than Smith initially had offered in addition to the $75,000 for the covenant not to compete.

Taxpayer argues, nonetheless, that he was wronged by Smith's offer, because the offer was less than fair market value. He assumes that since the business was appraised at $960,-000, his interest as a fifty per cent shareholder must be $480,000. Such is not the case, since the corporation was closely held and Smith, not taxpayer, had control.