JOSEPH E. RUSSO and SALLY S. RUSSO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Russo v. Comm'r
Docket Nos. 7193-76, 5523-77. United States Tax Court
T.C. Memo 1979-497; 1979 Tax Ct. Memo LEXIS 28; 39 T.C.M. (CCH) 691; T.C.M. (RIA) 79497; December 11, 1979, Filed Melvin M. Engel, for the petitioners. William D. Peltz, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of petitioners as follows: Docket No.
Year
Deficiency
7193-76
1970
$ 4,953
7193-76
1971
9,295
7193-76
1972
25,203
5523-77
1973
20,460
Some of the issues raised by the pleadings have been disposed of by the parties, leaving for decision only whether moneys that petitioner, Joseph E. Russo, received from a corporation are attributable entirely to the redemption of his corporate stock, thereby qualifying for capital gains treatment under section 302(a), I.R.C. 1954, *29 [1] or whether a portion of these amounts constitutes ordinary income received for termination of an employment contract. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Joseph E. Russo and Sally S. Russo, husband and wife, who resided in Houston, Texas, at the time of filing their petitioner in this case, filed joint Federal income tax returns for the calendar years 1970, 1971, 1972, and 1973 with the Internal Revenue Service Center, Austin, Texas. In 1967, the capital stock of Russo/Shindler, Cummins, Inc. (RSC) was owned by its three original shareholders as follows: Number
Percentage
Shareholders
of Shares
Ownership
Joseph E. Russo
2,500
40 Percent
James C. Shindler
2,500
40 Percent
E. J. Cummins
1,50
20 Percent
On October 1, 1967, Messrs. Russo, Shindler, and Cummins executed separate agreements with RSC, each entitled "Employment Contract." The term of the agreements was from October 1, 1967, to September 30, 1979. Messrs. Russo, Shindler *30 and Cummins each served as an executive officer of RSC. [2] Mr. Russo's contract provided in pertinent part: *31 3. The compensation and consideration to be paid by Company to the Employee, and which the Employee agrees to accept from the Company for services performed and to be performed by the Employee hereunder, is and shall be the sum of Twenty Four Thousand Dollars ($24,000.00) per year, payable in twelve (12) equal monthly installments in the amount of Two Thousand Dollars ($2,000.00) each, payable by the tenth (10th) day of each and every calendar month hereafter during the entire term of this agreement. It is understood that such compensation shall be in addition to "and not in lieu of) any shares of commissioners to which the Employee is or shall be entitled by reason of brokerage services performed by the Employee for or in behalf of the Company or any other salay which the Company may elect to pay to the Employee. 4. In the event of the death of the Employee during the term of this agreement, the Company shall continue to pay to the estate of the Employee the compensation which would otherwise be payable to the Employee hereunder for and during the entire term hereof (i.e. until September 30, 1979). *** The Employee may, without cause, terminate this *32 agreement upon thirty (30) days prior written notice to the Company. In such event, (i) the Employee shall continue to perform and render his services hereunder ad shall be paid his regular fixed monthly compensation up to the date of such termination, and (ii) thereafter, during the period from the date of such termination until September 30, 1979, the Employee shall act as an advisor and consultant to the Company, performing such services in such capacity as may be requested from time to time by the Company, and shall be paid therefor a monthly sum equivalent to Forty per cent (40%) of all deferred commissions actually paid to and received by the Company during the preceding calendar month, but in no event to exceed the sum to Two Thousand Dollars ($2,000.00) per month. It is understood that the aforementioned percentage shall be payable to the Employee notwithstanding the fact that he is not called upon by the Company to perform any consulting or advisory services and shall continue to be paid to the estate of the Employee in the event of his death prior to September 30, 1979. As with Mr. Russo, Mr. Shindler agreed, inter alia, to compensation and consideration *33 in the sum of $2,000 per month for 144 months; Mr. Cummins agreed to receive $1,000 per month for the same period. In 1967, RSC had deferred commissions amounting to $708,473. These commissions represented amounts which were to be received by the corporation over the periods of various leases which had previously been negotiated by the corporation. In order to allow the new shareholders to purchase a total of 25 percent of the corporate stock, RSC developed a plan whereby each of the original shareholders would sell 25 percent of his shares to new shareholders at a price reflecting the value of the corporation net of the deferred commissions receivable. The agreements, entitled "Employment Contract" quoted in part above, were entered into between RSC and Messrs. Russo, Shindler, and Cummins in furtherance of the plan of RSC to take in new shareholders. Messrs. Russo, Shindler, and Cummins each sold 25 percent of his stock for $24 per share directly to Messrs. Gustafson, Smith, and Miller. Upon completion of those sales transactions the resulting ownership of RSC was as follows: Number
Percentage
Shareholders
of Shares
Ownership
Joseph E. Russo
1,875
30 Percent
James C. Shindler
1,875
30 Percent
E. J. Cummins
937.5
15 Percent
James W. Gustafson
625
10 Percent
Barry W. Smith
625
10 Percent
Fred Miller
312.5
5 Percent
*34 On January 10, 1968, all the shareholders of RSC entered into the "Russo/Shindler, Cummins, Inc. Stock Purchase Agreement." Essentially that agreement entitled the corporation, and, subject to the right of the corporation, the shareholders to a right of first refusal should any shareholder decide to dispose of either a portion or all of his RSC stock. The relevant portions of that Stock Purchase Agreement provided: II. Notice. * * * In said notice such Stockholder shall irrevocably offer to sell and transfer such shares to the Company and, subject only to the prior right of the Company to acquire any of such shares, to its Stockholders or such of them as may elect to purchase, severally or collectively, any of such shares (i) at a price per share equal to the cash price or consideration per share and on the same terms specified in such notice, or (ii) in the event that no consideration is stated by the Stockholder for such shares the price shall be the Value Per Share of such Stock as determined by Section V hereof, * * *
IV. Termination of Association with Company. Within thirty (30) days after any stockholder shall cease for any reason to be associated *35 with the Company in any capacity other than as a stockholder, whether upon action by the Board of Directors of the Company or otherwise, such Stockholder shall offer all such shares of Stock owned of record or beneficially by him to the Company and subject only to the prior right of the Company to acquire any of such shares, to its Stockholders or such of them as may elect to purchase, severally or collectively, any of such shares at the Value Per Share as determined by Section V hereof, which offer shall be irrevocable for a period of ninety (90) days after the date of receipt. During such ninety (90) days period the options between the Company and its Stockholders shall exist for one-half of the time period provided for in Section III thereof. In the event such option to purchase is not exercised by the Company and/or the Stockholders within said ninety (90) day period, then such Stockholders may sell, assign, transfer, pledge or otherwise dispose of such shares of stock as he may see fit. V. Value Per Share. The term "Value Per Share" for shares of stock purchased and sold under this Agreement shall mean (i) the pro rata part of the base value $150,000.00, plus (ii) *36 the pro rata part of the book value of the Company to the extent such book value exceeds $30,000.00 plus (iii) the pro rata part of the excess of the market value over the book value of all assets of the Company, including securities and real property but excepting furniture, fixtures, leasehold improvements, vehicles, good will and other personal property of the Company plus, (iv) the pro rata part of all deferred commissions allocated to and retained by the Company, after December 31, 1967, plus (v) the remaining amounts which would be due or would have been earned under any employment contract in force between the retiring or deceased stockholder had such stockholder survived and/or remained a stockholder and/or employee until the completion or expiration date of such employment contract; the employment contracts to which this provision specifically applies are those employment contracts executed between the Company and Joseph E. Russo, James C. Shindler and Edward J. Cummins, dated October 1, 1967. The term "Book Value" as used herein shall mean the book value per share outstanding (including any shares of stock to be sold hereunder) as shown by and determined from the balance *37 sheet of the Company prepared by the regularly employed independent certified public accountants for the Company (which balance sheet is to be certified) in accordance with generally accepted principles of accounting as of the close of business of the Company on the last day of the calendar month next preceding the calendar month during which the Company receives a notice as provided in Sections II, IV or VI hereof. The term "market value" as used herein shall mean as to listed securities the average between the bid and asked price on the date of determination and as to unlisted securities and real property the appraised value of such unlisted securities and real property. In the determination of market values, as opposed to book value, if the parties involved are unable to agree on such market value then arbitrators appointed one by the Company and one by the selling Stockholder, or his personal representatives in the event of his death, and a third arbitrator appointed by the other two arbitrators shall arrive at such market value, which determination shall be conclusive and binding. Early in 1969, Mr. Russo decided to completely terminate his employment and shareholder relationships *38 with RSC. At the same time Mr. Gustafson resolved to sell his entire RSC stock holdings. Accordingly, a Termination Agreement dated February 27, 1969, was executed on March 19, 1969, with a retroactive effective date of January 31, 1969. That contract set forth numerous provisions confirming Mr. Russo's and Mr. Gustafson's withdrawals from the corporation. In pertinent part, the Termination Agreement stated: II. Purchase of Company Stock
A. Agreement to Purchase. For the considerations hereinafter stated and subject to the remaining terms and provisions hereof, Russo and Gustafson hereby agree to sell and convey to the Company, and the Company does hereby agree to purchase and acquire from Russo and Gustafson, a total of 2,500 shares of the capital stock of the Company (the "Company Stock"), consisting of all of the capital stock of the Company owned by Russo and Gustafson, collectively, and consisting of 1,875 shares owned by Russo (the "Russo Company Stock") and 625 shares owned by Gustafson (the "Gustafson Company Stock"), which shares represent, respectively, 30% and 10% of all of the issued and outstanding capital stock of the Company. Russo and Gustafson *39 shall hereinfter sometimes collectively be referred to as "R&G" * * *. B. Consideration. As consideration of the purchase of the Company Stock, the Company shall pay and assign or cause to be paid or assigned to R&G the following: 1. A sum eqyal to the "Value Per Share" multiplied times the number of shares of the Company Stock, all as computed and determined in accordance with the Stock Purchase Agreement (the "Stock Purchase Agreement") entered into between the Company and its stockholders under effective date of January 10, 1968, which determination shall be made by the accountant for the Company, Edgar L. Bauer, as of the Effective Date and shall be subject to verification (but not audit) by R&G and/or an accountant designated by R&G; * * *. * * *
The sums payable to Russo and Gustafson, respectively, as determined in accordance with the foregoing provisions of this Paragraph B are hereinafter referred to collectively as the "Base Purchase Price" and individually as the "Russo Base Purchase Price" and the "Gustafson Base Purchase Price". * * *
C. Payment of Base Purchase Price. Subject to the credits and deductions set forth below and to the remaining *40 provisions hereof, the Base Purchase Price shall be payable to Russo and Gustafson, respectively, at the time of closing hereof, as hereinafter specified, as follows: 1. To Russo. (a) A sum equal to 15% of the Russo Base Purchase Price shall be payable in cash at the time of closing hereof, less and except, however, 75% of the total of the amounts to be credited to the Company as part of the sale by the Company to R&G of certain leasehold improvements, furniture and other personal property as provided in Article III below; and (b) The balance of the Russo Base Purchase Price is to be evidenced and payable in accordance with the terms of a promissory note of the Company in such amount, to bear interest at the rate of 4% per annum, and to be payable to the order of Russo in ten (10) equal semi-annual installment s of principal, plus accrued interest commencing with August 1, 1969, which note (the "Russo Note") shall be secured by a pledge and security agreement (the "Russo Stock Pledge") covering and pledging the Russo Company Stock, which pledge and security agreement shall reserve and retain in the Company (until an event of default occurs thereunder), all voting and *41 dividend rights and privileges with respect to the Russo Company Stock: provided, however, that that portion of the Russo Base Purchase Price payable by reason of deferred commissions allocated to and retained by the Company for the period from January 1, 1968, to December 31, 1968 (and included in the determination of the "Value Per Share" as provided in the Stock Purchase Agreement) shall be excluded from the aforesaid 15% cash down payment and promissory note of the Company, and, instead, such commissions shall be payable only if, as and when the same are actually paid to and received by the Company, less and except a servicing fee of 20% thereof for cost of servicing and collection, all as provided and set forth in the form of letter agreement to be entered into between the Company and Russo attached hereto as Exhibit "B" and made a part hereof for all purposes. * * *
VIII. * * *
B. Resignations of Russo and Gustafson. Russo and Gustafson hereby resign as officers and directors of the Company, the Management Company, and the Northwest Management Company, all as of the Effective Date. Russo further agrees that that certain employment contract entered *42 into between Company and Russo effective as of October 1, 1967, is and shall be fully terminated and cancelled effective as of the Effective Date. Pursuant to the Termination Agreement, Mr. Gustafson actually terminated his shareholder status by selling all of this RSC stock to the corporation. The company's accountant calculated that RSC owed Mr. Gustafson $36,243.27 for its redemption of his 10 percent shareholder interest. Simialrly, in accordance with the Termination Agreement Mr. Russo in fact resigned his position as an executive officer and director of RSC, sold to the corporation his entire 30 percent share of RSC capital stock, and cancelled his Employment Contract with the company. The RSC accountant determined that in return the corporation owed Mr. Russo $364,729.79. The account's calculations were detailed as follows: Sale of Stock To Shindler/Cummins 1-31-69
Total per Agreement
$364,729.79
less deferred
commissions to
be collected
(43,554.38)
add: deferred
commissions actually
collected
6,516.26
$327,691.67
Detail of Total per Agreement
Book Value 1-31-69
$ 95,288.14
Plus: Income on
same as developed
by K.W.M. on
attached list of 4-6-69
1,963.22
Less: Item (ii) Part V
(30,000.00)
$20,175.41
Base value -
Item (i) part V
45,000.00
Plus: Increase in
deferred commission
after 12-31-67
Bal. 12-31-67
$605,692.00
Bal. 1-31-69
787,168.59
Increase
$181,476.59
Less: 20% collection
and Service Cost
36,295.32
$145,181.27
X30% (Mr. Russo's
percentage ownership of RSC)
43,554.38
$108,729.79
*43 Balance due under the employment contract
To interest owned by
Russo only --
Original balance
144 months at
$2,000.00 per month
$288,000
Less: amount paid
thru 1-31-69 (16
months at $2,000.00)
32,000
256,000.00
Total Interest Per Agreement
$364,729.79
Payable at 15% down and Balance in
10 semi-annual installments plus
interest at 4% per annum
Mr. Russo collected $54,600 under this agreement in each of the years 1970, 1971, and 1972 and collected $81,900 in 1973. In their income tax returns for the respective years petitioners reported the full amounts received as payments for the redemption of Mr. Russo's RSC stock. As a result, petitioners claimed long-term capital gains of $51,778 in each 1970, 1971, and 1972 and $77,666 in 1973 from the sale of the stock. Respondent recharacterized a portion of each year's collections as ordinary income by allocating $256,000 of the total $364,729.79 to payment for the termination of an unexpired portion of Mr. Russo's Employment Contract with RSC. The adjustment resulted in the following: Ordinary Income from
Capital Gain from
Termination of Employment Contract
Sale of Stock
Year
(78.12 Percent)
(21.88 Percent)
1970
$42,653.52
$ 9,123.53
1971
42,653.52
$9,123.53
1972
42,653.52
9,123.53
1973
63,980.28
13,685.29
*44 OPINION The only issue for our decision in this case is whether an amount received by Mr. Russo from RSC is attributable in its entirety to the redemption of corporate stock, entitled to capital gains treatment, or whether a portion of that payment constitutes recompense for the termination of an unexpired Employment Contract with the corporation, which share would be subject to ordinary income treatment. Pursuant to the Termination Agreement, in 1969 Mr. Russo terminated his RSC employment and sold his entire 1,875 shares of RSC capital stock to the corporation. Under the agreement Mr. Russo was to receive from RSC $364,729.79 over a term of years. Petitioners argue that all moneys received by Mr. Russo under the agreement were attributable to the sale of stock, a capital asset. They assert that RSC used a fixed formula price in its determination that it owed Mr. Russo $364,729.79 upon his terminating his RSC interests. Termination Agreement Article II(B)(1) referred to that fixed formula price as "Value Per Share" computed and determined in accordance with Article V of the Stock Purchase Agreement. While respondent concedes that Article V(i) through (iv) might represent *45 a valuation of shares on a per share basis, he views Article V(v) as being wholly separate and ineffective for valuing an individual share of stock. Instead, respondent argues that Article V(v) bound RSC to pay an additional fixed sum to any original shareholder for terminating his unexhausted Employment Contract. Petitioners attempt to refute respondent's position that Article V(v) does not affect the per share valuation of the RSC stock by arguing that the "Employment Contract" referred to therein is not what it purports to be. Petitioners urge us to overlook the contractual label and form of the Employment Contract. They contend that the substance of the transaction when viewed in its entirety shows that the agreement entitled "Employment Contract" was not in fact a contract of employment. Mr. Russo and the RSC Certified Public Accountant testified that the parties to the "Employment Contract" substantively intended it as a device to directly and temporarily reduce the per share valuation of RSC stock. By assessing the shares' worth net of corporate deferred commissions to be received on leases existing on December 31, 1967, the original shareholders envisioned attracting *46 prospective shareholders at affordable prices while using the "Employment Contract" to protect the original three shareholders' proportionate interests in the pre-December 31, 1967, deferred commissions. Petitioners argue that Article V(v) of the Stock Purchase Agreement could have been stated as "[the] pro-rata part of all deferred commissions allocated to and retained by the Company, before December 31, 1967", and that interpretation would conform the Article V(v) language to the pro-rata valuation wording of subsections (i) through (iv). Petitioners contend that the language change would not alter the meaning of the Stock Purchase Agreement, but rather, it would allow Article V(v) to assume an integral role in the fixed formula per share assessment so that Article V(i) through (iv) plus subsection (v) would reflect the proper pro-rata stock valuation of any original shareholder withdrawing after December 31, 1967. In response to petitioners' substance-over-form argument, respondent suggests that a taxpayer bears a heavy burden when attempting to repudiate the written form of a transaction to which he is a party. Respondent urges us to apply the rule of Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), *47 revg. 44 T.C. 549 (1965), which is: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * Neither this Court nor the Fifth Circuit to which an appeal in this case would lie has adopted the Danielson rule, but rather requires "strong proof" by a taxpayer to show that words of such a written agreement do not state its intent. Schmitz v. Commissioner, 51 T.C. 306, 318 (1968), affd. 457 F.2d 1022 (9th Cir. 1972); Mittleman v. Commissioner, 56 T.C. 171, 175 (1971), affd. 464 F.2d 1393 (3d Cir. 1972); Barran v. Commissioner, 334 F.2d 58 (5th Cir. 1964) affirming in part and reversing in part 39 T.C. 515 (1962); Sonnleitner v. Commissioner, 598 F.2d 464 (5th Cir. 1979) affirming a Memorandum Opinion of *48 this Court. The Fifth Circuit in Barran, supra at 63, held that where parties bargain at arm's length and the resulting agreement has a separate basis in economic reality, strong proof "must be adduced to overcome the declaration" of the finalized contract. The Court in Sonnleitner, supra, implied that only where the agreement lacks economic reality is the "strong proof" standard inapplicable. Although the majority of cases incorporating the "strong proof" rule have involved convenants not to compete, several cases have applied the strong proof rule to other types of agreements. Estate of Rogers v. Commissioner, 445, F.2d 1020 (2d Cir. 1971), affirming a Memorandum Opinion of this Court (mortgage); Stephens v. Commissioner, 60 T.C. 1004 (1973), affd. 506 F.2d 1400 (6th Cir. 1974) (binding contract to purchase stock); Pritchett v. Commissioner, 63 T.C. 149, 171 (1974) (real estate sales contract). In our view the appropriate burden of proof criterion for overcoming a written agreement which has economic reality is "strong proof." The plain language of the Russo/RSC Employment *49 Contract endows it with economic reality independent of any other contract. As executed, without the occurrence of any condition precedent, that contract legally entitled Mr. Russo to $24,000 per year, payable in 144 monthly installments of $2,000 during the period of October 1, 1967, through September 30, 1979. That the agreement had economic reality is evidenced by the fact that pursuant thereto Mr. Russo was paid $2,000 monthly by RSC from October 1, 1967, through early 1969. Therefore, it is incumbent upon petitioners to produce strong proof to overcome the presumption that the Employment Contract is anything other than its title and wording suggest. The clear wording of Articles 3 and 4 of the Employment Contract created RSC's liability to compensate Mr. Russo in consideration for services performed and to be performed. The payment schedule was arranged as a flat salary payable in equal monthly installments to Mr. Russo in addition to commissions or other compensation to which Mr. Russo might be entitled. It provided for Mr. Russo to act as an advisor to RSC if called upon to do so upon termination of his regular employment by RSC. Even though the parties to the Termination *50 Agreement never specifically bargained for monetary consideration to be paid upon the termination of any employment contract, the legal effect of the terminology of this contract is so clear that no such bargaining was necessary. The Termination Agreement Article VIII(B) coupled with the Stock Purchase Agreement Article V(v), which is incorporated in the Termination Agreement, induced an acceleration of the compensation payment schedule rather than nullifying or supplanting that contract. The language of the Employment Contract required the corporation to pay Mr. Russo the $24,000 per year for the unexpired portion of the contract. In our view, nothing in the Stock Purchase Agreement changes this obligation of the corporation. That agreement in effect merely provides that the corporation may purchase the employees' rights under the Employment Contract. This view of the Stock Purchase Agreement is borne out by the provision of the Termination Agreement that Mr. Russo "further agrees that that certain employment contract entered into between Company and Russo effective as of October 1, 1967, is and shall be fully terminated and cancelled effective as of the Effective Date." [3] *51 The fact that in accordance with his Employment Contract Mr. Russo received monthly installments of $2,000 from October 1, 1967, until his 1969 employment termination, further sustains our conclusion. Moreover, petitioners neither contended nor proved that on their 1967, 1968 and 1969 Federal income tax returns they attributed those $2,000 monthly receipts to any source apart from compensation, commissions, or other ordinary income items. Presuming that petitioners regarded the 1967 through 1969 installments as ordinary income, their 1970 through 1973 income tax treatment was inconsistent with the prior years' handling of these amounts. Petitioners further seek to persuade this Court that the Employment Contract constituted a part of the stock's per share valuation by asserting *52 that all parties, not just petitioners, shared in the positive and negative tax consequences of their argued allocation of funds. Petitioners reason that deferred commissions are a corporate asset which enhances the value of capital stock. Steffen v. Commissioner, 69 T.C. 1049 (1978). They argue that these commissions should be "capitalized" and treated as a portion of capital stock valuation which would result in the corporation not receiving the tax benefit of deducting the payments to Mr. Russo as a business expense. It may well be that the deferred commissions were an asset of the corporation. However, the Employment Contracts were liabilities of the corporation in the form of compensation payable. Only of incidental importance is the fact that those liabilities were tied to the asset of deferred commissions receivable, which relationship does not control the classification of the liabilities. Furthermore, there is no evidence in this record to substantiate petitioners' contention that RSC did not claim a business expense deduction for a portion of the payments made to Mr. Russo. [4] Yet they ask this Court to accept their contention that "[if] RSC intended *53 to take a deduction for payments made in termination of an employment contract, a provision to this effect could have been put into the Stock Purchase Agreement, or made the subject of a separate agreement." While we agree that such a provision could have been wsritten into an agreement, the lack of such a clause would not preclude RSC from claiming the deduction. If RSC and its stockholders had intended to cancel the Employment Contracts when the Stock Purchase Agreement was entered into, they could have written the agreement to state that which petitioner claims it was meant to state. They did not do so. Lastly, petitioners argue that the discrepancy in the moneys received by Mr. Russo and Mr. Gustafson upon the sales of their stock holdings to RSC is attributable *54 to the prior creation of two classes of capital stock. Mr. Gustafson received $36,243.27 for the redemption of his 10 percent interest in RSC. Comparatively, Mr. Russo, who had a 30 percent interest in the corporation, received $364,729.79. Respondent contends that if Mr. Russo were being paid solely for his 30 percent stock ownership, he would have received $108,729.79, three times the amount received by Mr. Gustafson. Petitioners claim that the entire $256,000 difference ($364,729.79 minus $108,729.79) is ascribable to the capitalization of corporate deferred commissions receivable before December 31, 1967, the amount presumably agreed upon the enhance the value of Mr. Russo's stock. Petitioners contend that because the RSC stock holdings of Messrs. Russo and Gustafson were redeemable at varying prices, the corporation created a second class of stock by informal actions when the Employment Contracts were executed.
The Revised Civil Statute, State of Texas, Business Corporation Act, Article 2.13A(2), allows for the creation of a special class of stock based upon "the price at and the *55 terms and conditions on which shares may be redeemed". However, Articles 2.12 and 2.13A require that the articles of incorporation specifically provide for the creation of such special classes of stock. While petitioners' argument that actions can create a second class of stock without the formal processes is not necessarily incorrect, petitioners have not shown that a second class of stock was actually created. The record is devoid of any showing that the Articles of Incorporation of RSC allow for the creation of a special class of stock. Moreover, the accountant for RSC testified that when Mr. Russo sold his RSC shares to the corporation not more than one class of stock existed. In considering the transaction as a whole and each of its components, we are of the opinion that Mr. Russo received $108,729.79 from RSC in redemption of his capital stock. It is clear that the stock redemption effected by the Termination Agreement qualifies for capital gains treatment under section 302(a) since the distribution was substantially disproportionate and not essentially equivalent to a dividend. On the other hand, the terms of the Employment Contract, the Stock Purchase Agreement, and the *56 Termination Agreement give those contracts separate as well as unified legal identities. We conclude that in substance and form the disputed $256,000 is attributable to compensation and consideration received by Mr. Russo upon termination of the unexpired portion of his Employment Contract. Petitioners effectively would have us rewrite the contracts now because in retrospect the agreements could have been written differently. There is no basis in this record for such a rewriting of the agreements. We therefore hold that the payments received by petitioners on the $256,000 paid for termination of their Employment Contract in each of the years here in issue constitute ordinary income. Because of the settlement of certain issues, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all authority references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Article 2 of the "Employment Contract" required of each employee: (a) To perform such duties and exercise such authority in such capacity as may be determined or assigned to him from time to time by the Board of Directors of the Company. (b) To employ and use his best efforts to promote the business of the Company and to pursue diligently his duties and assignments at all times, employing and following such techniques in connection therewith as might be suggested or requested by the Board of Directors of the Company. (c) To serve, without additional compensation, as a Director or in such other office or offices of the Company to which he may be appointed or elected by the Board of Directors or the stockholders of the Company. (d) Not to, during the effective period of this agreement, or any time within a period of ( ) months after the termination hereof, divulge or disclose to any other person, firm or corporation any of the listings or prospects or other confidential information of the Company which the Employee has acquired or otherwise been made aware of during the term of this agreement; and (e) At the termination of this agreement, to submit in writing to the Company a complete and composite list of all listings and prospects which the Employee has procured or generated or is then working on or in connection with, or which have been presented to the Employee or of which the Employee is then aware, and which relate in any manner or way to the real estate brokerage business and/or the business of the Company.↩
3. Certainly had another stockholder rather than the corporation purchased Mr. Russo's stock, that stockholder would not have paid Mr. Russo "the remaining amounts which * * * would have been earned [by Mr. Russo] under any employment contract in force * * *" between Mr. Russo and the corporation without receiving for such payment an assignment of Mr. Russo's rights under his Employment Contract.↩
4. The accountant for RSC testified in an equivocal manner that he told Mr. Shindler that if the payments to Mr. Russo were for the stock, the payments were not deductible by the corporation. This testimony in no way shows that some of the payments were not deducted by the corporation. In any event, the manner in which the corporation handled the payments would not be controlling of the issue here presented.↩