COMDISCO, INC., Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 83–3250.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1984.

Decided March 6, 1985.

---

Edward C. Rustigan, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellant.

Jay W. Miller, Appellate Section, Dept. of Justice, Tax Div., Washington, D.C., for defendant-appellee.

Before ESCHBACH, Circuit Judge, PELL, Senior Circuit Judge, and GORDON, Senior District Judge.[*]

PELL, Senior Circuit Judge.

Comdisco, Inc., a Delaware corporation with its principal place of business in Illinois, appeals from the judgment entered by the district court dismissing its action for refund based upon the Government's refusal to grant investment tax credits. On appeal, this court must determine whether plaintiff is entitled to the credits, which depends upon whether the district court held correctly, under the applicable statutes and regulations, that plaintiff was neither the "lessee" nor the "original user" of the disputed property.

## I. THE STATUTORY FRAMEWORK

### A. The Investment Tax Credit.

In 1962, Congress added to the Internal Revenue Code provisions establishing an investment tax credit for investments in certain depreciable property. Congress eliminated the credit in 1969 but then re-enacted the legislation, in substantially the same form, as part of the Revenue Act of 1971. Section 38(a) of the Code, 26 U.S.C. § 38(a), provides: "There shall be allowed, as a credit against the tax imposed, the amount determined under" sections 46 through 48 of the Code. The Code refers to property coming within the parameters of the investment tax credit provisions as "section 38 property." Section 46(a) establishes the formula to determine the amount of a credit to which a taxpayer is entitled, section 46(b) provides for the carryback and carryover of unused credits, and section 46(c) defines those investments that qualify for the credit. In this case, neither party questions the amount of the credit claimed, the use of the carryback and carryover provisions, or the qualifying characteristics of the investments.

Rather, the dispute centers around section 48, which governs the use of the investment tax credit with respect to leased property. Section 48(b) allows taxpayers to treat certain leased property as "new section 38 property" as long as the parties lease the property within three months after it is placed in service. Section 48(d)(1) allows the parties to a lease of such new section 38 property to treat the lessee as having acquired the property so that the lessee then may claim the investment tax credit. Section 48(d)(3) also allows a lessee, to whom a lessor has assigned the right to use an investment tax credit, to assign the credit to any subsequent sublessee, subject to the three-month restriction of section 48(b).

The Treasury Department has promulgated a number of regulations pursuant to section 48. Regulation 1.48–1(c), for example, defines tangible personal property, the only property for which a taxpayer may claim a credit, to include "all property (other than structural components) which is contained in or attached to a building," including office equipment. 26 C.F.R. § 1.48–1(c) (1984). Under the regulations, the entitlement of a lessee to the use of an investment tax credit turns upon whether the lessee is an "original user" of the property: "[T]he election is not available if the lessee is not the original user of the property." 26 C.F.R. § 1.48–4(a)(iii). The regulations provide that " 'original use' means the first use to which the property is put, whether or not such use corresponds to the

[*] Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by desig-
nation.

use of such property by the taxpayer." 26 C.F.R. § 1.48–2(b)(7). Furthermore,

> The determination of whether the lessee qualifies as the original user of leased property shall be made ... as if the lessee actually purchased the property. Thus, the lessee would not be considered the original user of the property if it had been previously used by the lessor or another person.... However, the lessee would be considered the original user if he is the first person to use the property for its intended function. Thus, the fact that the lessor may have, for example, tested, stored, or attempted to lease the property to other persons will not preclude the lessee from being considered the original user.

26 C.F.R. § 1.48–4(b).

The legislative history surrounding passage of the investment tax credit reveals the hope of Congress that the credit would stimulate economic growth by providing a substantial incentive to undertake capital investment projects. Thus, the Report of the House of Representatives stated: "It is believed that the investment credit ... will provide a strong and lasting stimulus to a high rate of economic growth and will provide an incentive to invest comparable to those available elsewhere in the rapidly growing industrial nations of the free world." H.Rep. No. 1477, 87th Cong., 2d Sess., 1962–63 Cum.Bull. 405, 412. The same report also discussed the rationale of the section 48(d) election for leased property, which is "desirable since, as a result of this provision, it is possible for the lessor to pass the benefit of the investment credit on to the party actually generating the demand for the investment." *Id.*, 1962–63 Cum.Bull. at 418.

The Senate Report reflected similar concerns about both the lease provision, S.Rep. No. 1881, 87th Cong., 2d Sess., U.S.Code Cong. & Admin.News 1962, p. 3297, 1962–63 Cum.Bull. 707, 725, and the tax credit in general:

> This investment credit, coupled with the depreciation guidelines recently liberalized by the administration, by stimulating capital formation, will provide growth in the economy consistent with the principles of a free economy. This investment credit, by encouraging the modernization and expanded use of capital equipment, will improve our competitive position abroad and thus aid in meeting the balance-of-payments problem. Moreover, the capital formation induced by this credit will both aid in providing the longrun growth needed by our domestic economy and be of major assistance in our immediate problem of economic recovery.

*Id.*, U.S.Code Cong. & Admin.News 1962, p. 3304, 1962–63 Cum.Bull. at 707–08. Furthermore, the Senate Report stated that "[t]he objective of the investment credit is to encourage modernization and expansion of the nation's productive facilities and thereby improve the economic potential of the country, with a resultant increase in job opportunities and betterment in our competitive position in the world economy." *Id.*, U.S.Code Cong. & Admin.News 1962, p. 3314, 1962–63 Cum.Bull. at 717. The Report also noted that, to ensure the intended impact of the tax credit legislation, "[t]angible personal property is not intended to be defined narrowly." *Id.*, U.S.Code Cong. & Admin.News 1962, p. 3318, 1962–63 Cum. Bull. at 722.

Finally, with respect to the 1971 re-enactment of the investment tax credit, the Senate again noted the broad incentive effect that it intended the credit legislation to have. The Senate expressed the concern that, without the credit,

> our tax policies do not adequately encourage investment in more modern and efficient machinery which would enable our businessmen to compete more effectively in foreign markets.... The guideline [for this legislation] has been not only the need to adopt a proposal which is fair, but also the restoration of sound and vigorous economic conditions—which requires the stimulation of both consumption by individuals and investment by business.

S.Rep. No. 92–437, 92d Cong., 1st Sess., U.S.Code Cong. & Admin.News 1971, pp. 1825, 1924, 1972–1 Cum.Bull. 559, 563. Similarly, the Report stated that "[t]he new credit is expected to bolster the economy and create additional jobs by encouraging expenditures on machinery and equipment which have been sagging badly." *Id.* As to the lease election provision, the Report noted that, with respect to noncorporate taxpayers, "the restoration of the credit could once again make leasing arrangements motivated largely by tax reasons quite attractive," but nonetheless agreed that the provision was desirable for corporate taxpayers. *Id.*, U.S.Code Cong. & Admin.News 1971, p. 1950, 1972–1 Cum.Bull. at 583.

B. Regulation Y.

Plaintiff buys and sells new and used IBM computer equipment and arranges leases on new and used computer equipment. In late 1973 and early 1974, plaintiff entered three transactions, which formed the basis of this suit, with Decimus Computer Leasing Corporation, a company that also arranges leases of computer equipment. As a subsidiary of a bank holding company, Decimus is subject to the provisions of Regulation Y, promulgated by the Federal Reserve Board. Among other things, Regulation Y has required, and continues to require, that banks and bank holding company subsidiaries that lease personal property must receive a minimum level of return on their leases. 12 C.F.R. § 225.-25(b)(5) (1984). *See also* 12 C.F.R. § 225.-4(a)(6) (1983). The determination of the requisite level of return encompasses a variety of factors, including the length of the lease and the amounts of both the rental payments and any penalties for early termination.

## II. THE FACTS

The first transaction involved plaintiff, Decimus, and E-Systems, Inc., and originated when plaintiff proposed it to Decimus. On December 28, 1973, Decimus and E-Systems executed a lease whereby E-Systems rented certain equipment from Deci-

mus for sixty months at a monthly rental of $12,725. Decimus retained the right to the investment tax credit under the lease. On the same day, Decimus assigned to plaintiff all its rights and obligations under the lease. Also on the same day, Decimus and plaintiff entered into a lease agreement, with Decimus purportedly leasing to plaintiff, for sixty months at $12,725 per month, the same equipment covered by the Decimus/E-Systems lease. The plaintiff/Decimus lease transferred the investment tax credit to plaintiff and authorized plaintiff to sublease the equipment to E-Systems. There was no sublease agreement between plaintiff and E-Systems. Decimus delivered the equipment to E-Systems, and E-Systems made all rental payments directly to Decimus. The district court found that the purpose underlying the plaintiff/Decimus lease "was to transfer to plaintiff the tax credit to which Decimus was entitled in lieu of a commission to Comdisco under the Decimus-E-Systems transactions." If Decimus had paid the broker's commission that plaintiff normally would have earned for arranging the deal, the terms of the transaction would not have complied with Regulation Y. The transfer of the investment tax credit functioned as a substitute for a commission.

The second transaction involved plaintiff, Decimus, and the Pratt & Whitney Division of United Aircraft Corporation. The parties signed all of the documents relating to the transaction on January 2, 1974, although the record does not reveal the order of the signings. Pratt & Whitney agreed to lease certain equipment from Decimus at $73,381 per month for forty-eight months, with Decimus retaining both the investment tax credit and the right to assign the lease "to a third party, said third party to become Lessor's primary lessee for the equipment under another lease." Decimus also assigned to plaintiff all rights and obligations under the Pratt & Whitney lease. Additionally, plaintiff and Decimus entered a lease agreement involving the same equipment leased to Pratt & Whitney. The plaintiff/Decimus lease contained the

following provisions: the monthly rent was $73,381 per month; the term of the lease was for sixty months; the lease authorized plaintiff to sublease the equipment to Pratt & Whitney; and, Decimus agreed to transfer the investment tax credit to plaintiff. Plaintiff and Pratt & Whitney never entered any sublease agreement. Although the Decimus/Pratt & Whitney lease did not satisfy Regulation Y, the plaintiff/Decimus lease did, because of its longer term. Decimus delivered the equipment to Pratt & Whitney, which paid the rent directly to Decimus. After the forty-eight months of Pratt & Whitney's lease expired, plaintiff then leased the equipment to Hartford Fire Insurance Company.

Plaintiff, Decimus, and Carolina Power & Light Company entered a third three-way transaction, again with the parties signing all of the relevant documents on January 2, 1974. The equipment lease between Decimus and Carolina Power ran for sixty months at $34,846 per month, with Decimus retaining the right to the investment tax credit and a right-to-assign clause similar to the one in the Pratt & Whitney lease. Decimus assigned to plaintiff all its rights and obligations under the lease with Carolina Power. Decimus and plaintiff also entered a sixty-month lease agreement involving the same equipment, which gave plaintiff authority to sublease to Carolina Power and transferred the investment tax credit to plaintiff. The rental rate was $35,317 for the first thirty-six months of the term and $35,132 for the remaining portion of the term. The slightly higher rent payments allowed the plaintiff/Decimus lease to satisfy Regulation Y while the Decimus/Carolina Power lease did not. Plaintiff and Carolina Power never entered into a sublease agreement. Decimus delivered the equipment to Carolina Power, which remitted its rental payments directly to Decimus.

On its fiscal 1974 corporate tax forms, plaintiff claimed an investment tax credit pursuant to the three transactions. Because that credit was more than plaintiff could utilize in 1974, plaintiff filed a claim for a refund of $61,103 of its 1973 tax payments based upon the carryback provisions of the Internal Revenue Code. 26 U.S.C. § 46(b). The Internal Revenue Service denied plaintiff's claim, and this suit followed.

## III. THE DISTRICT COURT PROCEEDING

Plaintiff filed its claim for a tax refund in late 1979. In 1981, both sides moved for summary judgment. In a memorandum opinion entered on November 18, 1981, the district court denied the motions. Because there were controverted factual issues "as to whether Comdisco had ever had any control over the computers sufficient to qualify it as a 'user,'" the district court rejected the Government's contention on summary judgment that Comdisco was not the "original user" of the equipment and, therefore, could not claim the credit. The court noted that plaintiff need not ever have physically used or possessed the property to qualify as the "original user." *See* Rev.Rul. 71–243, 1971–1 Cum.Bull. 7. The court also rejected, for the time being, the Government's claim that plaintiff was merely an assignee of Decimus and never a lessee. The court noted that, to qualify for the credit, plaintiff had to have been more than an assignee of preexisting rights, but rather it must have incurred "rights and obligations under the contracts different from those already owed by Decimus to the various third parties." Thus, the district court denied summary judgment and required the parties to submit additional evidence to establish that plaintiff was either a lessee or an assignee.

A brief trial on the merits occurred on October 31, 1983. Two days later, the district court entered judgment in favor of the Government, dismissing plaintiff's claim. After reciting extensive "Findings of Fact," the district court's entire "Conclusions of Law" stated:

1. The Court has jurisdiction over this action by virtue of 28 U.S.C. § 1346(a)(1).

2. Plaintiff was not the "original user" within the meaning of 26 C.F.R.

§ 1.48–4(a)(iii) of the equipment in issue and therefore cannot avail itself of the investment tax credit attributable to the acquisition thereof.

3. Plaintiff was not a "lessee" within the meaning of 26 U.S.C. § 48(d)(1) of the equipment in issue and therefore cannot avail itself of the investment tax credit attributable to the acquisition thereof.

4. Plaintiff is not entitled to a refund and the complaint should be dismissed with prejudice.

When the district court initially announced the decision orally, its primary concern was with the fact that there was never a sublease agreement executed between plaintiff and the third parties, E-Systems, Pratt & Whitney, and Carolina Power. Thus, the judge concluded that Decimus had simply "shopp[ed] around for somebody that could use the tax credit, ... [which] is not the purpose of the statute." In short, the court determined that, for purposes of the investment tax credit, plaintiff was an assignee, despite the existence of the formal leases between Decimus and plaintiff.

Plaintiff appeals the district court judgment only with respect to the transactions involving Pratt & Whitney and Carolina Power, but not with respect to E-Systems.

## IV. ANALYSIS

█ The Government alleges, and plaintiff does not dispute, that the question whether plaintiff was a lessee of the equipment involved in the disputed transactions is a question of fact. Therefore, the district court's "Conclusions of Law" label notwithstanding, we must review the district court's finding that plaintiff was not a lessee under the clearly erroneous rule. Fed.R.Civ.P. 52(a). *See, e.g., State National Bank v. United States,* 509 F.2d 832, 837 (5th Cir.1975). Under recent Supreme Court doctrine, rule 52(a) applies regardless of whether we label the factual issue as an "ultimate" finding of fact or a "subsidiary" finding. *Pullman-Standard v. Swift,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). *See also Commissioner v. Duberstein,* 363 U.S. 278, 286,

80 S.Ct. 1190, 1197, 4 L.Ed.2d 1218 (1960) (donor's motive or intent determines whether a conveyance is a gift for tax purposes; intent question and "ultimate" question whether conveyance is a gift are both fact questions subject to rule 52(a)). Thus, we no longer need to decide into which of those two categories the district court's findings fall.

In seeking affirmance, the Government repeatedly emphasizes the fact that there was no written sublease running between plaintiff and either Pratt & Whitney or Carolina Power. In essence, the Government contends that the transactions between plaintiff and Decimus were shams, or, at best, assignments, entered for the sole purpose of transferring to plaintiff otherwise unusable investment tax credits. The credits were otherwise unusable because neither Decimus nor either of the third parties had any use for additional tax credits. The Government concludes from the absence of any formal sublease that plaintiff was merely lessor-by-assignment of the leases running between Decimus and the third parties. Plaintiff's status as lessee of Decimus thus depends, in large part, upon whether plaintiff was actually sublessor to the third parties. Because the third parties had possession and use of the relevant equipment, if plaintiff were not their sublessor, then plaintiff would have received nothing from the purported leases with Decimus. Despite the Government's vehement assertion to the contrary, we perceive nothing in the record to indicate that plaintiff had no obligation to Decimus in the event of a default by the third parties. In fact, plaintiff was the only party that owed any obligation to Decimus because the third parties owed their duties to plaintiff and not Decimus after Decimus assigned to plaintiff the benefits of the third parties' obligations to it. The fact that the third parties remitted rental payments directly to Decimus indicates only that the parties sought to save themselves the transactional costs of making two separate payments when one payment was obviously sufficient to dispose of all parties' duties.

Furthermore, if the sixty-month plaintiff/Decimus lease was merely a sham, as the Government contends, then the property rented by Pratt & Whitney should have reverted to Decimus at the expiration of Pratt & Whitney's lease. Actually, it was plaintiff, and not Decimus, that subsequently leased the equipment to another party.

As it turned out, neither Pratt & Whitney nor Carolina Power ever defaulted on any of their obligations, although well-respected corporations, for one reason or another beyond their control, and much to the surprise of investors, have failed to meet their obligations. We do not regard it as speculative that, if either Pratt & Whitney or Carolina Power had defaulted on their obligations to pay, Decimus would have taken the ordinary route pursued by most creditors of looking to a financially responsible obligor—in this case, Comdisco. In any event, the factors relied upon by the Government to show that plaintiff was not the primary lessee of Decimus are not persuasive. The two principal factors advanced by the Government are: first, that the third parties remitted rental payments to Decimus, rather than to plaintiff, the purported sublessor; and, second, that Decimus delivered the equipment to the third parties without plaintiff ever having physical possession or control thereof. Yet, we must agree with plaintiff that these factors, either separately or in combination, fail to establish that plaintiff was not the lessee-sublessor of the equipment. The Government would have us ignore both the transactional efficiencies and the business realities involved in the direct remission of rental payments by the sublessee to the principal lessor as well as the direct delivery by that lessor to the sublessee without the lessee-sublessor ever gaining possession of the property.

The Government's position that plaintiff's participation in these transactions was a sham also implicitly ignores the assignments made by Decimus to plaintiff. Plaintiff's lack of physical possession of the equipment during the term of the third parties' leases with Decimus and the direct rental payments from the third parties to Decimus are, at most, ambiguous in determining whether plaintiff was a lessee. Decimus unambiguously assigned to plaintiff all its rights and obligations under its leases with the third parties. Thus, plaintiff stood in the position of lessor to the third parties. Furthermore, other factors also indicate that the economic realty of the transactions was that plaintiff was the lessee-sublessor. In particular, in the Pratt & Whitney transaction, it was plaintiff who gained possession of and then relet the equipment after Pratt & Whitney's lease expired; one year still remained on the lease between plaintiff and Decimus. Similarly, in the Carolina Power transaction, plaintiff had to pay to Decimus the incremental rent between that required by Carolina Power's lease with Decimus and plaintiff's lease with Decimus. Both the reversionary interest and the incremental rent are consistent with plaintiff's assertion that it was a lessee of Decimus.

■ Perhaps the most significant factor in support of plaintiff's position, however, is that, if we view the leases between Decimus and the third parties as somehow independent of plaintiff's involvement, those leases fail to comply with Regulation Y. As such, in all likelihood, Decimus would have been unable to enforce the third parties' obligations if they had defaulted because, in general, a contract entered in violation of statutory or regulatory law is unenforceable. *See, e.g., United States v. Mississippi Valley Co.*, 364 U.S. 520, 563–66, 81 S.Ct. 294, 315–17, 5 L.Ed.2d 268 (1961) (contract entered in violation of federal conflict-of-interest statute); *Quinn v. Gulf & Western Corp.*, 644 F.2d 89, 92–94 (2d Cir.1981) (contract entered in violation of federal procurement regulations). *See generally* E. Farnsworth, Contracts §§ 5.5–.6 (1982); L. Simpson, Contracts § 222 (2d ed. 1965). Nothing suggests that the rule of unenforceability would be inapplicable in cases involving violations of Regulation Y.

All parties entered into the transactions with the knowledge that the leases between Decimus and the third parties did not comply with Regulation Y if they were considered to be independent of plaintiff's involvement. This court doubts that business people with as much experience as the parties in this case would enter an unenforceable contract, knowing of its unenforceability, when an enforceable transactional structure was as easily available to them. Clearly, therefore, the parties intended their transactions to have the same effect as a lease followed by a sublease. As the Government concedes, if the parties had entered into a normal lease-sublease sequence, there would be no doubt about the validity of Decimus' transfer of the investment tax credit. Yet, the record establishes that the parties intended their deals to have the exact same effect.

■ The legislative history indicates that Congress intended that the tax credit provisions should be broadly construed. For instance, the Senate Report states that the property qualifying for the credit "is not intended to be defined narrowly." S.Rep. No. 1881, 87th Cong., 2d Sess., U.S.Code Cong. & Admin.News 1962, p. 3318, 1962–63 Cum.Bull. at 722. Additionally, the extensive citations to Congressional history in section I.A., *supra,* indicate the critical importance that the credit is to have in the invigoration of the economy through capital expenditure.

In consideration of the economic effects that Congress intended the tax credit to have and in light of the many factors consistent with plaintiff's assertion that it was a lessee, within the meaning of that term for purposes of the tax credit legislation, this court should respect the parties' evident intention that plaintiff was Decimus' lessee. To deny plaintiff the credit would defeat the purposes of the statutory scheme. Without plaintiff's participation, the transactions could not have occurred, because of Regulation Y. Thus, in a real sense, plaintiff was the party "actually generating the demand for the investment," to whom Congress intended the

credit to be passable. H.Rep. No. 1477, 87th Cong., 2d Sess., 1962–63 Cum.Bull. at 418. Allowing plaintiff to claim the credit in accordance with Decimus' explicit election, therefore, effectuates both Congressional policies of stimulating capital investment and granting the credit to the party without whom the investment could not have occurred.

■ We recognize the source of the skepticism with which the Government viewed the transactions in this case. In form, plaintiff is the lessee of Decimus and the assignee of Decimus' lessor status, not the sublessor, with respect to the third parties. Certainly, the parties would have been far wiser to have included in the deals express subleases between plaintiff and the third parties, despite the asserted logistical advantages of structuring the deals as the parties did. Out of this skepticism comes the Government's final proposed rationale for affirmance of the district court's decision: that the parties should be bound to the form of transaction that they adopted. Indeed, the Government is correct when it notes that, in a wide variety of tax litigation, while the Commissioner may attack the nominal form of a transaction in order to enforce the tax laws, *see, e.g., Higgins v. Smith,* 308 U.S. 473, 477–78, 60 S.Ct. 355, 357–58, 84 L.Ed. 406 (1940); *Sullivan v. United States,* 618 F.2d 1001, 1007 (3d Cir.1980), a taxpayer generally may not disavow the form of a deal, *see, e.g., Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 149, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974).

■ While another circuit has found no unfairness in this disparate treatment between a taxpayer and the Government, *Spector v. Commissioner,* 641 F.2d 376, 386 (5th Cir.1981), *cert. denied,* 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171, the question of binding a taxpayer to the form of its transaction apparently has never arisen in the context of an investment tax credit case. Often called the *Danielson* rule, after *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir.1967), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123, the

disparate treatment arose and has since been applied in cases where two parties to a deal have both sought to acquire beneficial tax treatment. The most common type of case in which the form-substance question arises is where there is a question whether a transaction is a liquidation or a sale of a business. *See, e.g., Bradley v. United States,* 730 F.2d 718 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 250, 83 L.Ed.2d 187. Depending upon the nature of the deal, one party or the other, but not both, will receive the beneficial treatment. *See Sonnleitner v. Commissioner,* 598 F.2d 464, 466–67 (5th Cir.1979). The form of the deal usually results in one party claiming the benefits. If the second party later disavows the form of the deal, the Government would be faced with the prospect of having to proceed against both taxpayers to resolve who should receive the advantageous treatment. Instead, the *Danielson* rule has evolved and received general acceptance. The only exception to the general rule allowing the Government to bind taxpayers to the form of their transactions when the Government faces potentially conflicting claims arises in cases where the challenge is necessary to avoid unjust results. *See, e.g., Ullman v. Commissioner,* 264 F.2d 305, 308 (2d Cir.1959). *Accord Sonnleitner v. Commissioner,* 598 F.2d at 467.

▮ In contrast to the conflicting claims cases, the Government will never be faced with conflicting claims to the investment tax credit because of the requirement that the investment tax credit can only be transferred pursuant to an express assignment of the credit. 26 U.S.C. § 48(d)(1). We see no reason to extend the Government's power to hold a taxpayer to the technical form of its transactions to situations in which the Government will never face conflicting claims. Therefore, in this case, we abandon the approach that binds a taxpayer to the labels given to a transaction in favor of an analysis that looks at the economic substance of the transaction. *See Frank Lyon Co. v. United States,* 435 U.S. 561, 573, 98 S.Ct. 1291, 1298, 55 L.Ed.2d 550 (1978), and cases cited therein.

▮ In this respect, the Fifth Circuit's observations in *Weinert's Estate v. Commissioner,* 294 F.2d 750 (5th Cir.1961), are convincing:

Resort to substance is not a right reserved for the Commissioner's exclusive benefit, to use or not to use—depending on the amount of the tax to be realized. The taxpayer too has a right to assert the priority of substance—at least in a case where his tax reporting and actions show an honest and consistent respect for the substance of a transaction.

*Id.* at 755. *But see Sullivan v. United States,* 618 F.2d at 1007 (only Commissioner can pierce the form of a transaction to determine its economic substance). A taxpayer whose transactions meet in substance a clear expression of Congressional intent, as it does here, for inclusion in a tax benefit should not invariably be at the mercy of governmental whim to decide which route to take, dependent, often it seems, on which way revenue will be produced. We think that the present case calls for application of the reasoning and rule expressed in *Weinert's Estate.* In the present case, the economic reality of the disputed transactions, as we have already delineated, is that plaintiff was the lessee-sublessor of the equipment, and the parties undertook no actions inconsistent with that characterization. Therefore, plaintiff was a "lessee" for purposes of section 48(d)(1). The district court's finding to the contrary was clearly erroneous.

In addition to its unsuccessful claim that plaintiff was not a lessee, the Government also asserts, and the district court found, that plaintiff was not the "original user" of the equipment within the meaning of 26 C.F.R. § 1.48–4(a)(iii). If that assertion is correct, then plaintiff would not be entitled to the investment tax credit. The Government asserts that plaintiff could not be the original user because it never possessed or utilized the equipment before the third parties did. Yet, as the district court acknowledged in its opinion denying the cross-motions for summary judgment, the leading

Revenue Ruling on the subject of what constitutes an original user supports plaintiff's position that neither utilization nor ·possession is a prerequisite to claiming the investment tax credit. In Rev.Rul. 71–243, one corporation leased equipment to a second corporation and elected to treat the second corporation as the owner of the equipment for purposes of the investment tax credit. The second corporation then subleased the property to a third corporation but retained the right to the investment tax credit. The Commissioner allowed the second corporation to claim the credit. This ruling necessarily implied that the second corporation was the "original user" of the equipment, or else it never would have been entitled to claim the credit. Nonetheless, the second corporation enjoyed no more than momentary possession of the property. The original use to which both the first and second corporations put the equipment was the use of the property in their leasing businesses. *See* 26 C.F.R. §§ 1.48(b), 1.48–4(c).

The district court evidently predicated its ruling that plaintiff was not the original user of the equipment upon its finding that plaintiff was not a lessee, because the court previously had stated correctly that "the 'original user' provision of the Code does not preclude Comdisco from receiving the investment credits." For, as we have previously noted, "the provision of Section 48(d)(1) allowing a lessor to pass through the investment credit to a lessee would be superfluous if a lessor could not be the 'original' user of property in the course of its leasing business." *Illinois Valley Paving Co. v. Commissioner*, 687 F.2d 1043, 1045 (7th Cir.1982) (per curiam). Because we have determined that plaintiff was a "lessee" of the equipment for purposes of the credit, the decision in *Illinois Valley Paving Co.* and the regulations cited in the previous paragraph make clear that the act of subleasing the equipment to the third parties qualifies as the "original use" of the equipment. Consequently, the district court's finding that plaintiff was not the original user of the property· was clearly erroneous.

## V.  CONCLUSION

The findings of the district court that plaintiff was neither a lessee of nor the original user of the relevant equipment are clearly erroneous. Consequently, we REVERSE the judgment of the. district court and REMAND with· directions that judgment be entered on behalf of plaintiff with respect to both the Pratt & Whitney and Carolina Power transactions.